# EXHIBIT A

**EXHIBIT A**

**DESERET MUTUAL'S REPLY TO INDIVIDUAL PARAGRAPHS OF GARDNER'S RESPONSE TO DESERET MUTUAL'S STATEMENT OF BACKGROUND FACTS AND GARDNER'S STATEMENT OF ADDITIONAL ELEMENTS AND ADDITIONAL FACTS**

**GARDNER'S RESPONSE TO DESERET MUTUAL'S STATEMENT OF BACKGROUND FACTS**

**Deseret Mutual's Background Fact No. 7.**   At work, Mr. Gardner openly discussed his weapons collection with associates and co-workers, including associates he supervised on the Enrollment and Retirement teams.  *Bryce Gardner Depo* at 184:5-24, attached hereto as Exhibit B-3.

**Gardner's Response to Background Fact No. 7:**   Disputed.        The Gardners dispute that Mr. Gardner openly discussed his weapons collection or that he even has a "weapons collection."   Deseret Mutual misrepresents Mr. Gardner's deposition statements.  The portions of Mr. Gardner's deposition referred to by Deseret Mutual do not provide that Mr. Gardner openly discussed guns.  It merely provides that other employees knew that he had a concealed carry permit.  See Deposition of Bryce Gardner attached as Exhibit "A", pg 184:5-24.  Mr. Gardner stated in his deposition that the only time he spoke of his guns (which he did not bring to work) is when people asked about it.  *Id* at 186:21-22.  Deseret Mutual's characterization that Mr. Gardner is an avid gun owner is false.   See also Declaration of Bryce Gardner, attached as Exhibit B, ¶2.  Mr. Gardner does not have a weapons collection; he owns two guns, a handgun and a rifle.  Ex. A at 8:19-20; Ex. B at ¶3-4.  Deseret Mutual appears to be making the spurious argument that Mr. Gardner's lawful exercise of his Second Amendment right to own guns creates a presumption against him that he is a danger and threat to his co-workers.  This absurd notion is patently false.

**Deseret Mutual Response:**  This purported dispute does not dispute the fact asserted, and

instead admits it.

**Deseret Mutual's Background Fact No. 8.**  Mr. Gardner carried a knife to work.  *Id.*   At 185:4-8; 23-24 (testifying that co-workers knew that he had a knife), attached hereto as Exhibit B-3.

**Gardner's Response to Background Fact No. 8:**  The Gardner's dispute that this is relevant to this motion for summary judgment.  The Gardner's do not dispute that Mr. Gardner occasionally carried a knife to work.  Ex. A at 185:7-8.

1

He did not discuss it with his co-workers.  *Id.* at 185:25 and 186:1.  However, Deseret Mutual fails to provide the necessary explanation that it was a utility type pocket knife.  Mr. Gardner stated in his depositions that it was a collapsible knife with an approximate three and a half inch blade.  *Id* at pg 9:6-12.  Mr. Gardner also testified that it was common for Deseret Mutual employees to carry these types of knives.  *Id.* at 185:7-24.  Deseret Mutual is attempting to take out of context two unrelated facts, Mr. Gardner ownership a knife and facebook post, in order to encourage the erroneous implication that Mr. Gardner was an aggressive employee who threatened his co-workers.  This is not the case.  At no time during his employment with Deseret Mutual, did Mr. Gardner engage in any act or communication that would give any other employee reason to be concerned about their safety or well-being or to be fearful or scared of him.  Ex. B at ¶¶7-9.  The depositions, affidavits and pleadings on file do not support Deseret Mutual's attempt to create this illusion.

**Deseret Mutual Response:**  This purported dispute does not dispute the fact asserted, and instead admits it.  The remaining response is merely a conclusion.

## GARDNER'S RESPONSE TO STATEMENT OF ELEMENTS AND UNDISPUTED MANTERIAL FACTS
### 1.  Elements of Breach of Contract

**Mr. Gardner's Claim for Breach of Contract**
***Element for a Claim for Breach of Contract:*** *Undisputed material facts show that Mr. Gardner cannot establish __the existence__ of an implied contract arising out of the employment handbook.*  *Johnson v. Morton Thiokol, Inc., 818 P.2d 997, 1002 (Utah 1991).*

**Gardners' Response to Element for a Claim of Breach of Contract.**  The Gardners dispute Deseret Mutual's statement of the elements for a claim of Breach of Contract because Deseret Mutual has failed to state the elements for a claim of Breach of Contract.  Rather, Deseret Mutual provides an argumentative statement as to the Plaintiff's ability to establish the element.  A cause of action for breach of an employment contract requires the following elements: "(1) a contract, (2) performance by the party seeking recovery, (3) breach of contract by the other party, and (4) damages." *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶14, 20 P.3d 388.[1]

---

[1] Deseret Mutual acknowledges that the Mr. Gardner's statement of elements more appropriately complies with the local rules.

**Gardners' Response to Concise Statement of Facts Supporting Partial Summary Judgment in Deseret Mutual's Favor:**

**Deseret Mutual's Statement of Fact 11.**   As part of Mr. Gardner's initial employment paperwork, he read, understood and signed a *Conditions of Employment Statement* on February 21, 2006 ("Employment Statement"). Exhibit C; *Gardner Depo* at 145:24-147-16, attached hereto as Exhibit B-6.

<u>**Gardners' Response to Statement of Fact 11.**</u>    Admit.

**Deseret Mutual's Statement of Fact 12.**   The   Employment   Statement provided, I agree and understand that the contents of this handbook and all Deseret Mutual manuals dealing with employment policies are presented as a matter of information only and **<u>are not to be understood or construed as a promise or contract between Deseret Mutual and its employees</u>**. I understand and agree that **<u>I have received no promise from Deseret Mutual regarding potential length of employment</u>** or promotion of any kind. I further understand that I have **<u>the right to terminate</u>** my employment at any time and that **<u>Deseret Mutual retains a similar right</u>**. Exhibit C (emphasis added).

<u>**Gardners' Response to Statement of Fact 12.**</u>    Admit.

**Deseret Mutual's Statement of Fact 13.**   The   Deseret   Mutual   HR   Policy Manual, a portion of the handbook, states,It is the policy of Deseret Mutual that its Human Resources Policies are to be used as an outline of the basic Human Resources practices and procedures for Deseret Mutual. They are not intended to alter the employment-at-will relationship in any way (See Employment-At-Will Policy 1 06).*GNROOJ88, Selections/rom Deseret Mutual's HR Policy Manual* attached hereto as Exhibit D.

<u>**Gardners' Response to Statement of Fact 13.**</u>    Admit.

**Deseret Mutual's Statement of Fact 14.**   Section 106 outlines that,It is the policy of Deseret Mutual that all associates who do not have a written employment contract with Deseret Mutual for a specific, fixed term of employment **are employed at the will of Deseret Mutual for an indefinite period.***Id.* at GNROO193 (emphasis added).

<u>**Gardners' Response to Statement of Fact 14.**</u>    Admit.

**Deseret Mutual's Statement of Fact 15.**   Comment 1 to Section 106 states, "Associates who do not have a separate, individual written employment contract are employed at the will of Deseret Mutual and are subject to termination at any time, for any reason, with or without cause or notice." *Id.*

**Gardners' Response to Statement of Fact 15.**     Admit.

**Deseret Mutual's Statement of Fact 16.**     Comment 2 to Section 106 begins, "No Deseret Mutual representative is authorized to modify this policy for any associate or to enter into any agreement, oral or written, that changes the at-will relationship." *Id.* at GNR00194.

**Gardners' Response to Statement of Fact 16.**     Admit.

**Deseret Mutual's Statement of Fact 17.**     Comment 3 further clarifies that, This policy may not be modified by any statements contained elsewhere in Deseret Mutual Human Resources policies, or any other associate handbooks, employment applications, Deseret Mutual recruiting materials, Deseret Mutual memoranda, or other materials provided to applicants and associates in connection with their employment. **None of these documents, whether singly or combined, create an express or implied contract of employment for a definite period, . . . or an express or implied contract concerning any terms or conditions of employment.** Similarly, Deseret Mutual policies and practices with respect to any matter are not to be considered as creating any contractual obligation on Deseret Mutual's part or as stating in any way that termination will occur only for 'just cause.' Statements of specific grounds for termination set forth in Human Resources policies or in any other Deseret Mutual documents are examples only, not all-inclusive lists, **and are not intended to restrict Deseret Mutual's right to terminate at-will.** *Id.* (emphasis added).

**Gardners' Response to Statement of Fact 17.**     Admit.

**Deseret Mutual's Statement of Fact 18.**     Section 211 also provides that, Termination and discharge procedures are only guidelines and do not constitute a legal contract between Deseret Mutual and its associates. Deseret Mutual reserves the right to implement its policies and procedures as it sees fit. In addition, specified grounds for termination are not all-inclusive since Deseret Mutual reserves the right to terminate employment for any reason. *Id.* at GNR00220.

**Gardners' Response to Statement of Fact 18.**     Admit.

**Deseret Mutual's Statement of Fact 19.**     In his deposition, Mr. Gardner admitted that he agreed to and understood these terms. *Gardner Depo* at 156:16-17, attached hereto as Exhibit B-7.

**Gardners' Response to Statement of Fact 19.**     Disputed.   Deseret Mutual mischaracterizes Mr. Gardner's deposition testimony.   During his deposition, Deseret Mutual's counsel read portions of Section 106 from Deseret

Mutual's HR Policy Manual and what appears to be section 106.  Mr. Gardner was then asked if he understood what was read to him.  Mr. Gardner stated that he did and further stated "Again, this was also adjusted after I was terminated."  Ex. A at 156:9-17.  Accordingly, it was not Mr. Gardner's testimony that he agreed to and understood the terms of Section 106.

**Deseret Mutual Response:**  There is no dispute that Mr. Gardner testified "[y]es" when asked if he understood Deseret Mutual's policy that associates are employed "at will." *Deposition of Bryce Gardner* at 156:9-17.  Regarding any purported dispute as to whether Section 106 was in place during Mr. Gardner's employment, the selections cited in Deseret Mutual's primary brief reference the version of the Deseret Mutual HR Policy Manual *produced by Mr. Gardner* in the litigation (see bates numbers beginning GNR).  The sections cited in Deseret Mutual's primary brief and those reviewed during the deposition are identical, and the cited sections were not "adjusted" or amended prior to or after Mr. Gardner's termination.

**Deseret Mutual's Statement of Fact 20.**   Mr. Gardner testified that he understood that his employment was at-will. *Id. a*t 156:6-8, Ex. B-7.

**Gardners' Response to Statement of Fact 20.**   Denied.  Mr. Gardner testified that his employment was at-will at the time of his hire. Ex. A at 156:1-25. He further contends subsequent to his hiring the at-will employment changed as DMBA treated certain portions of the employee handbook as binding on its employees, thereby creating in implied-in-fact contract.  Ex. A at 13:20-23 and 83:9-17

**Deseret Mutual Response:**  This purported denial should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  The deposition testimony clearly provides as follows:

Q:     Do you understand that you had an at-will relationship with Deseret Mutual?

A: Yes ma'am.

*Deposition of Bryce Gardner* at 156:6-8.

**2. Elements of Breach of Covenant of Good Faith and Fair Dealing**

[*Text Omitted]*

**Gardners' Response to Deseret Mutual's Concise Statement of Facts Supporting Partial Summary Judgment in Deseret Mutual's Favor** See Gardners' response to Statements of Fact 11-20.

**Deseret Mutual Response:** *See Deseret Mutual's response to facts 11-20.*

**3. Elements of Retaliation under FMLA and Title VII**

*[Text Omitted]*

**Gardners' Response to Deseret Mutual's Concise Statement of Facts Supporting Partial Summary Judgment in Deseret Mutual's Favor:**

**Deseret Mutual's Statement of Fact 21.** After discovering Ms. Gardner's serious performance issues, Deseret Mutual terminated her employment on Thursday, August 1, 2013. *Gardner Depo* at Exhibit 1, attached hereto as Exhibit E.

**<u>Gardners' Response to Statement of Fact 21.</u>** The Gardners dispute that Ms. Gardner's employment with Deseret Mutual was terminated due to serious performance issues. Rather, Mrs. Gardner was terminated for complaining about discrimination because of her race and gender and because she was pregnant. While she was employed by Deseret Mutual, Mrs. Gardner was good at her job. See Deposition of Yohana Gardner attached as Exhibit "C", pg 147:24-25. Mrs. Gardner received emails from her team leader, Kerri, telling her that she had done a good job on her calls. *Id.* at 148:6-7. Just before her termination, Mrs. Gardner received an award for taking in the most walk-ins of her team. *Id*.at 148:7-9. She also received awards based on customer responses. *Id.* at 148:10-12.

Mrs. Gardner became pregnant in approximately May of 2013. *Id. a*t 116:20-22. Mrs. Gardner gets really sick when she is pregnant. *Id.* at 117:12-13. Immediately after becoming pregnant she began getting sick. *Id.* at 116:23-25. After Mrs. Gardner's supervisors became aware of her pregnancy they began harassing her and subjecting her to a hostile work environment. *Id.* at 153:14-16. Due to her pregnancy, Mrs. Gardner became very sick and would throw up

approximately three or four times a day, and it was necessary for her to spend additional time in the bathroom. *Id.* at 177:1-9 and Ex. A at 34:2-4. Her supervisors began harassing her about the number of bathroom breaks she was taking. Ex. C at 151:23-25 and 152:1-10. After Mrs. Gardner announced her pregnancy one of her supervisor's behavior toward Mrs. Gardner became hostile and harassing. *Id.* at 183:18-22. Her supervisors began monitoring her every move and bathroom break. *Id.* at 86:17-20 and 87:4-8. They began monitoring all the time when she logged in, went to lunch, took a break and logged out. *Id.* at 88:6-9. When they would comment about the time she spent, Mrs. Gardner would inform them that it was due to her pregnancy related sickness and that she could not help it. *Id.* at 152:11-13. However, they continued to send constant emails demanding updates as to where she was going, where she was, how long she was gone, and why was she gone so long. *Id.* at 86:25; 87:1-6; 153:6-16 and 154:1-4. Through this behavior Mrs. Gardner's supervisors attempted to keep her at her desk without any breaks by reaming her out when she took breaks. *Id.* at 86:17-20 and 155:2-6.

Mrs. Gardner felt that she was being discriminated against and was receiving disparate treatment because she was a minority and she was pregnant. *Id.* at 86:12-15. Mrs. Gardner went to speak with the vice president, Jana Sybrowsky, and informed her of the behavior of her supervisors. *Id.* at 94:12-25; 95:1. Ms. Sybrowsky told Mrs. Gardner that she would look into the issue. *Id.* at 96:5-7. Subsequently, Ms. Sybrowsky met with Mrs. Gardner and indicated that they were looking into moving her to another team so that she would not have to work under her current supervisors. *Id.* at 96:11-17. However, Ms. Sybrowsky later informed Mrs. Gardner that she was too valuable to her team and that they would not be moving her. *Id.* at 101:10-16 and Ex. A at 43:16-18. After the meeting with Jana, the situation worsened. One of her supervisors in particular refused to even look at Mrs. Gardner. Ex. C at 105:2-5. She felt like she was on her supervisors "target list." *Id.* at 105:2-5 and 111:11-17. Realizing that she would be required to continue to work under her supervisors, on June 20, 2013, Mrs. Gardner sent a conciliatory email to one of her supervisors. A copy of the Email is attached hereto as Exhibit "D." Mrs. Gardner sent the email because she feared she would be retaliated against for complaining about discrimination; that her job was on the line. Ex. C at 108:9-11; 186:24-25 and 187:1-4.

On July 8, 2013, Mrs. Gardner submitted a request for FMLA accommodation to Deseret Mutual because of her pregnancy. A copy of the Request is attached hereto as Exhibit "E." On July 12, 2013, Deseret Mutual informed her that she was eligible for FMLA accommodation. A copy of Deseret Mutual's approval is attached hereto as Exhibit "F."

Approximately, six weeks after complaining of discrimination and less than a month after applying for FMLA leave, Mrs. Gardner's employment was terminated on August 1, 2013. See Termination Letter, a copy of which is attached hereto as Exhibit "G." Deseret Mutual stated that she was being terminated because during the period between May 1, 2013, through July 31, 2013, during her pregnancy and related sickness, Mrs. Gardner had, allegedly, intentionally

disconnected 52 calls.  *Id*.  Deseret Mutual did not provide Mrs. Gardner with any documentation to support the allegations that she had intentionally dropped the calls.  Ex. C at 188:15-25 and 189:1.  Mrs. Gardner disputes that she was terminated for intentionally disconnecting phone calls.  Prior to her pregnancy, Mrs. Gardner never hung up any calls.  *Id*. at 115:22-24.  After her pregnancy, Mrs. Gardner may have disconnected a few calls, one or two, because she had to throw up because of her pregnancy related sickness, not the 52 calls alleged by Deseret Mutual.  *Id*. at 114:13-25; 116:9-10.   Nonetheless, Mrs. Gardner was meeting the specified amount of calls.  Ex. A at 55:3-7.  Mrs. Gardner was not informed or warned prior to her termination that there was an issue with her number of dropped calls.  *Id.* at 79:15-22.  She was not given an opportunity or allowed to address the issue as Deseret Mutual had allowed her to do in prior instances.  Ex. C at 180:20-25 and 181:1-3.

During the same time, Deseret Mutual failed to terminate other similarly situated employees who had intentionally disconnected more call than Mrs. Gardner allegedly disconnected.   For that same period, Chad Loveland, a Caucasian, male employee, disconnected approximately 333 telephone calls.  Ex. A at 69:24-25; 70:1-17; and 71:18-20.  In a single day, June 24, 2013, Chad disconnected at least 78 telephone calls.  *Id.* at 69:2-4;124:20-25; and 125:1-21 and Ex. C at 164:1-21.  Chad was given an opportunity to correct his issues.  Ex. A at 73:20-25 and 74:1-3.  Despite his numerous dropped calls, Chad was promoted, while Mrs. Gardner was terminated.  *Id.* at 67:11-21.

**Deseret Mutual Response:**  These facts are irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

**Deseret Mutual's Statement of Fact 22.**  Mr. Gardner was notified of Ms. Gardner's termination and allowed to escort her home. *Gardner Depo* at 165:15-23, attached hereto as Exhibit B-8.

**Gardners' Response to Statement of Fact 22.**  Admit.

**Deseret Mutual's Statement of Fact 23.**  On Monday, August 5, 2013, Mr. Gardner returned to work at Deseret Mutual. *Id.* at 100:25-101:8, attached hereto as Exhibit B-9.

**Gardners' Response to Statement of Fact 23.**  Admit.

**Deseret Mutual's Statement of Fact 24.**  He requested a meeting with General Counsel, Scott Eastmond, to express his concerns that Ms. Gardner was being

treated differently from other associates. *Id.* at 86:14-15, attached hereto as Exhibit B-1 0.

**Gardners' Response to Statement of Fact 24.**     Admit.

**Deseret Mutual's Statement of Fact 25.**     Mr. Gardner presented a three-page written document addressing his concerns to Mr. Eastmond at their meeting. *Gardner Depo* at Exhibit 2, attached hereto as Exhibit F.

**Gardners' Response to Statement of Fact 25.**     Admit.

**Deseret Mutual's Statement of Fact 26.**     The document included a conclusion that Ms. Gardner's termination "represents a targeted, personal, discriminative, retaliatory, wrongful termination of a pregnant minority who voiced her concern regarding inconsistencies between how she, as a minority[,] was being treated compared to those who are Caucasian." *Id.; see also id.* at 31:3-4, attached hereto as Exhibit B-11. (testifying that the purported complaint to Deseret Mutual was "about disciplinary inconsistencies regarding Caucasians and minorities").

**Gardners' Response to Statement of Fact 26.**     Admit.

**Deseret Mutual's Statement of Fact 27.**     During his deposition, Mr. Gardner asserted that Ms. Gardner's managers and the Vice President of Operations "had it out" for Ms. Gardner because she "is extremely personable, she's friendly, she's happy and everyone loves her. She does an excellent job, she's an excellent worker and in my opinion both Donna [McReavy] and Allison [Bishop, Ms. Gardner's managers] were envious and jealous of the attention Yohana always received." *Gardner Depo* at 45:13-20, attached hereto as Exhibit B-12.

**Gardners' Response to Statement of Fact 27.**     Denied.     Deseret Mutual implies that these are Mr. Gardner's sole beliefs as to why his wife was terminated, which is false.  As set forth above and as further set forth in the Additional Undisputed Facts below, Mr. Gardner opposed his wife's termination because he believed that she was being subject to gender, pregnancy and racial discrimination and because she had applied for FMLA leave.

**Deseret Mutual Response:**  This alleged dispute should be disregarded under the Sham Affidavit Rule because it attempts to contradict deposition testimony.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").

***4. Element Three of a Claim of Retaliation under FMLA or Title VII:***

[*Text Omitted*]

**Gardners' Response to Deseret Mutual's Concise Statement of Facts Supporting Partial Summary Judgment in Deseret Mutual's Favor:**

**Deseret Mutual's Statement of Fact 28.**   Shortly after the meeting with Mr. Eastmond ended, Mr. Gardner posted the following message on www.facebook.com: You rue the day you mess with my family. I hear my wife in tears because of the injustice brought upon her. Believe me, justice will be served. I won't sit by idly and watch the one I love treated like garbage. Yohana, I love you. You are my rock, my everything. It's time to bring the rain! [sic] *Gardner Depo* at Exhibit 16, attached hereto as Exhibit G.

**Gardners' Response to Statement of Fact 28.**   The Gardners dispute the implication in Deseret Mutual's Statement of Fact 28 that Mr. Gardner's facebook post is in response to the meeting with Mr. Eastmond. The facebook post was not made until the afternoon of August 5, 2013, after Mrs. Gardner called Mr. Gardner in tears. A copy of the facebook post is attached hereto as Exhibit "H." Mr. Gardner met with Mr. Eastmond on the morning of August 5, 2013. *Id.* at 86:14-15 and 181:14-15. Mrs. Gardner was not present at the meeting. *Id.* at 86:14-15 and 181:14-15. The post indicates that is in response to his wife calling him in tears on the afternoon of August 5. Ex. H. At lunch that day, Mr. Gardner's wife called him in tears. *Id.* at 181:15-16 and 173:20-21. Mrs. Gardner told him that her father had contacted a heating and cooling company to repair their air conditioning unit that had malfunctioned. *Id.* at 172:10-23. Before the repairman was scheduled to inspect the air conditioning unit, Mrs. Gardner's friend repaired the unit. *Id.* at 172:24-25 and 173:1-6. Mrs. Gardner's father company and informed them that the unit had been repaired. *Id.* at 173:6-12. Nonetheless, a repairmen showed up and Mrs. Gardner informed him that the matter had been resolved. *Id.* at 173:12-19. The repairmen then made highly derogatory, racist, sexist and offensive comments to Mrs. Gardner and her parents. *Id.* at 173:13-19. Mr. Gardner's facebook post was in response to the repairman's treatment of his wife and family. *Id.* at 172:11-12 and 173:20-21. Mr. Gardner explained this to Deseret Mutual when he was first confronted about the post. Deseret Mutual has no evidence, and has supplied no evidence, to refute Mr. Gardner's testimony on this issue.

**Deseret Mutual Response:** Mr. Gardner does not dispute that he made the Facebook post or the content of the Facebook post. The remaining unsupported statements are irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of

contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and

FMLA. *See Stover v. Martienz,* 382 F.3d 1064, 1076 (10th Cir. 2004) (stating that on summary

judgment, the relevant inquiry is not whether [the employer's] proffered reasons were wise, fair[,]

or correct, but whether [the employer] honestly believed those reasons and acted in good faith

upon those beliefs").

**Deseret Mutual's Statement of Fact 29.**     This post was seen by a number of associates and co-workers of Mr. Gardner, and was forwarded to management. *Declaration of Scott Eastmond* at ¶10; *Declaration of Donna McReavy* at ,¶¶11-14; *Declaration of Allison Bishop* at ,¶7.

<u>**Gardners' Response to Statement of Fact 29.**</u>     Disputed.       The Declarations identify that Mr. Eastmond, Ms. McReavy, and Ms. Bishop, saw a print out brought to them by another co-worker of the facebook post. However, other than conclusory statements that the post was seen by associates and co-workers, the Declarations do not identify other individuals who saw the post nor provide evidence to support the statements.   Moreover, the Gardners have scheduled depositions for Jana Sybrowski [sic], Donna McReavy and Allison Bishop, and will continue to schedule the deposition of employees at Deseret Mutual for the purpose of determining which associates and co-workers viewed the facebook post.

**Deseret Mutual Response:** This is a conclusion and not a factual dispute supported by

admissible evidence and Mr. Gardner's failure to timely conduct discovery cannot defeat summary

judgment.

**Deseret Mutual's Statement of Fact 30.**     Associates expressed their fears to Deseret Mutual managers that Mr. Gardner, an avid gun owner, would seek violent retribution for the termination of his wife. *Declaration of Scott Eastmond* at ¶11; *Declaration of Donna McReavy* at ¶¶6, 13-14; *Declaration of Allison Bishop* at ¶¶7-9.

<u>**Gardners' Response to Statement of Fact 30.**</u>     Disputed.   Other than the conclusory statements that other associates expressed concern, Deseret Mutual does not identify any individual nor provide evidence to support their statement. Mr. Eastmond, Ms. McReavy, and Ms. Bishop do not have personal knowledge as to whether other associates were fearful of Mr. Gardner.   Contrary to Deseret

11

Mutual's statement, while Mr. Gardner was on administrative leave for opposing Mrs. Gardner's termination, he was contacted by Joey King, an employee of Deseret Mutual asking when Mr. Gardner would be returning because Mr. Gardner "actually get[s] things done. Ex. A at 191:9-15.

Plaintiffs dispute that the associates at Deseret Mutual feared retribution from Mr. Gardner. The only associates identified as being fearful of Mr. Gardner are Ms. McReavy and Ms. Bishop. However, nothing in their declarations support the notion that any alleged fear was based on justified concerns. As support for her claim that she feared for her personal safety, Ms. McReavy cites that after Mr. Gardner returned to work their "relationship became increasingly strained," he "stopped consulting me about management issues and began circumventing me" and that their working relationship "became difficult and was no longer collaborative." Accordingly, Ms. McReavy allegedly became fearful because Mr. Gardner did not want to work with her anymore. Similarly, Ms. Bishop cites as support for her claim that she was fearful that Mr. Gardner became critical of her job performance and watched to see if she made mistake. As an example she states that during one meeting Mr. Gardner wrote a note to himself that "[Allison] didn't bring the thought." Thus, Ms. Bishop felt personally threatened because Mr. Gardner supposedly monitored her work performance.

These reasons do not justify the fearfulness that Ms. McReavy and Ms. Bishop claim. Indeed, Ms. McReavy's August 6, 2013 letter belies the fact that there are substantial discrepancies between the affidavit she attached to this motion and the contemporaneous letter she signed at the time. See Donna McReavy Letter dated August 6, 2013 attached as Exhibit "I." Indeed, the justification given for this alleged fearfulness is so weak that the affidavits themselves might serve as evidence of the pretextual nature of Deseret Mutual's claims. It is also noteworthy that the Gardners have not yet been afforded the opportunity to challenge these witnesses in deposition in order to cross examine them in regards to their professions of fearfulness. Rather the Court has been presented with "canned" affidavits prepared to meet the requirements of a particular argument formulated by Deseret Mutual and its counsel. This Court should delay consideration of Deseret Mutual's motion for partial summary judgment until the Gardners have been afforded an adequate opportunity to depose these witnesses.

**Deseret Mutual Response:** This lengthy response is a conclusion and not a factual dispute

supported by admissible evidence.

**Deseret Mutual's Statement of Fact 31.**     This post was reasonably perceived as threatening to co-workers and associates at Deseret Mutual, a fact that was admitted by Mr. Gardner during his deposition. *Gardner Depo* at 178:11-24; 179: 8-12, attached hereto as Exhibit B-13. (stating, "sure, she could have possibly viewed it as a threat"); *see also id.* at 180:12-24 (stating that it would be unreasonable for

employees not on Mr. Gardner's team to view the Facebook threat as a threat because "I never interacted with them").

**Gardners' Response to Statement of Fact 31.** Disputed. The Declarations identify that Mr. Eastmond, Ms. McReavy, and Ms. Bishop, saw a print out brought to them by another co-worker of the facebook post. However, other than conclusory statements, the Declarations do not identify other individuals who saw the post nor provide evidence to support the statements. Moreover, the Gardners have scheduled depositions for Jana Sybrowski, Donna McReavy and Allison Bishop, and will continue to schedule the deposition of employees at Deseret Mutual for the purpose of determining which associates and co-workers viewed the facebook post.

Moreover, the Gardners dispute that it is reasonable for employees of Deseret Mutual to view the Facebook post as a threat. The post consists of a series of vague, generalized statements of Mr. Gardner's feelings related to an apparent injustice served on his wife. Ex. H. There is no threat in the post. *Id*. There is no individual or group of individual identified as to whom the post is directed. *Id*. There is no proposed action identified or indicated within the post. *Id*. It is unreasonable to view such generalized statements as a threat to anyone.

That it is unreasonable to view the post as a threat is further shown by Ms. McReavy's letter to Deseret Mutual's Director of Human Resources. In her letter, Ms. McReavy states that

the posting did not contain an explicit threat; however, it did appear to have a veiled threat to people involved with [his wife's] termination. Due to the uncertainty and vagueness of the posting, it's difficult to determine his intentions. The posting could have been done for a range of reasons from venting frustration to wanting to harm people's reputations to the potential for destruction of property or physical harm.

Ex. I. The letter acknowledges that the post is not an explicit threat. It further acknowledges that the post is uncertain and vague and they do not know what Mr. Gardner's intentions are. It is important to note that Ms. McReavy is one of the two individuals who is now alleging that the post was directed at her and that she feared for her personal safety. This letter clearly contradicts the statements in her Declaration.

It is also unreasonable to view the post as a threat because of the time lapse between Mrs. Gardner's termination and its posting to facebook. Mrs. Gardner was terminated on Thursday, August 1, 2013, the day before the Gardners were leaving on their annual family camp. Ex. A at 101:8-18. Mrs. Gardner had the long weekend to process her termination. Ex. B at ¶10. The facebook post was not made until the afternoon of August 5, 2013, after the Gardners had returned from their vacation and after Mrs. Gardner called Mr. Gardner in tears regarding the repairman. Ex. A at 181:15-16; 173:20-21 and Ex. H. The clear implication of the post is that it is in response to something that happened on the afternoon of August

5 to upset Mrs. Gardner such that she would call her husband in tears. Because she was fired on August 1 this could not have been the impetus for the post. It is unreasonable to view the post as a threat because of the time lapse between Mrs. Gardner's termination and its posting to facebook.

Significantly, on August 1, 2013, Mr. Gardner had specifically blocked Ms. McReavy and Ms. Bishop from his facebook account such that they did not have access to any of his posts. Ex. A at 230:3-13. Because he had intentionally blocked them from viewing his posts the August 5 post could not have been a threat directed by Mr. Gardner to them. Soon after making the post to facebook, Mr. Gardner was contacted by Ms. Sybrowsky about the post. *Id.* at 173:22-23. Mr. Gardner immediately removed the post from facebook. *Id.* at 173:24-25. The next day, August 6, Mr. Gardner again met with Ms. Sybrowsky who told him that he had handled things right. *Id.* at 174:13-22. After that meeting with Jana, no further action was taken with respect to the facebook post, nor was it discussed again, until this litigation. Ex. B at ¶12. Deseret Mutual misrepresents Mr. Gardner's deposition statement. Mr. Gardner specifically stated that it was not reasonable for Deseret Mutual employees to feel threatened by the post. *Id.* at 180:12-24.

More importantly, the post talked about seeking justice, nothing else. Although Mr. Gardner was speaking about the repairman's treatment of his wife and family, even assuming that employees at Deseret Mutual thought the post was about them, it still would be improper for Deseret Mutual to terminate Mr. Gardner because of the post, because he is only talking about "seeking justice." Seeking justice is exactly what the legal process is about. Indeed, even if Deseret Mutual truly believed that the facebook post was about Mrs. Gardner's termination, which it was not, it would still be a Title VII and FMLA Interference violation for Deseret Mutual to terminate Mr. Gardner for the post. It would be truly anomalous for a Court to conclude that a statement regarding seeking justice for a reasonably perceived wrong is not protected activity within the meaning of the applicable statutes here.

Nothing in the post constitutes a threat. The post clearly identifies that something occurred on August 5 to upset Mrs. Gardner whereas her termination occurred on August 1. Deseret Mutual's evidence does not provide support for the claim that the post is reasonably perceived as threatening, and even if Deseret Mutual truly believed that the post was about Mrs. Gardner's termination, it would still be a violation for Deseret Mutual to retaliate against Mr. Gardner for posting it.

**Deseret Mutual Response:** This lengthy and argumentative response is conclusory and does not contain relevant facts supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

14

***5. Burden-Shifting Element if Plaintiff Makes a Prima Facie Case:***

[*Text Omitted*]

**Gardners' Response to Deseret Mutual's Concise Statement of Facts Supporting Partial Summary Judgment in Deseret Mutual's Favor:**

**Deseret Mutual's Statement of Fact 32.** Because of this public threat, Mr. Gardner's presence was disruptive to associates. *Declaration of Scott Eastmond* at ¶12; *Declaration of Donna McReavy* at ¶¶16-19; *Declaration of Allison Bishop at*¶¶10-14.

**<u>Gardners' Response to Statement of Fact 32.</u>** The Gardners dispute that the post was a public threat. See Gardners' Response to Statement of Fact 31. The Gardners dispute that Mr. Gardner's presence was disruptive to associates. Deseret Mutual provides unsupported, conclusory statements that Mr. Gardner's presence was disruptive. As set forth in response to Statement of Fact 31, the Declarations of Donna McReavy and Allison Bishop do not provide evidence that Mr. Gardner's presence was disruptive. The evidence merely provides that the working relationship between Mr. Gardner, Ms McReavy and Ms. Bishop was strained in part due to the part they played in the termination of Mrs. Gardner and Mr. Gardner protected opposition to perceived discrimination. This does not support the conclusion that Mr. Gardner's presence was disruptive. Moreover, even if his actions were disruptive, the disruption was protected activity, i.e. he was opposing discriminatory treatment of his wife, a co-worker. It is illegal for Deseret Mutual to retaliate because of that kind of 'disruption.'

Other than the conclusory statements that Mr. Gardner's presence was disruptive to other associates, Deseret Mutual does not identify any individual nor provide evidence to support their statement. The Declarations allege that other co-workers were upset and fearful but the Declarations do not identify other individuals who saw the post nor provide evidence to support the statements. Moreover, the Gardners have scheduled depositions for Jana Sybrowski, Donna McReavy and Allison Bishop, and will continue to schedule the deposition of employees at Deseret Mutual for the purpose of determining which associates and co-workers viewed the facebook post or were concerned over it. The Court should delay decision on the Motion for Partial Summary Judgment until the Gardners have had an adequate opportunity to identify and interview these witnesses.

**Deseret Mutual Response:** This response is conclusory and does not contain facts supported by admissible evidence. The Facebook post speaks for itself. Deseret Mutual has set forth its burden of presenting admissible evidence and Mr. Gardner's unsupported conclusions

regarding that evidence do not defeat summary judgment.  Regarding the request to delay decision

on Deseret Mutual's motion, Mr. Gardner has not sought leave under Fed. R. Civ. P. 56(f).  Further,

the case has been pending since August of 2014, and Mr. Gardner has had sufficient time to depose

relevant witnesses.

**Deseret Mutual's Statement of Fact 33.**    Deseret Mutual management hoped that Mr. Gardner's erratic behavior would subside and that he would be able to return to work as normal. Declaration of Scott Eastmond at ¶13.

**Gardners' Response to Statement of Fact 33.**    Gardners dispute that his behavior was erratic.  There is no evidence that Mr. Gardner's behavior was erratic.  Deseret Mutual does not present any evidence of any erratic behavior other than the conclusory statement that it hoped Mr. Gardner's erratic behavior would subside.  Rather than being 'erratic' Mr. Gardner consistently engaged in protected behavior by opposing his wife's discriminatory termination.

The evidence in this matter is contrary to Deseret Mutual's claim that they were concerned about Mr. Gardner's erratic behavior.  On August 5, 2013, Mr. Gardner had a meeting with Scott Eastmond in which he expressed his opposition to Mrs. Gardner's termination.  Ex. A at 86:14-20.  After that meeting, Mr. Gardner began feeling hostility from his co-workers, specifically, Jana, Allison and Donna. *Id.* at 86:20-21.  Mr. Gardner loved his job and his position but had felt hostility from other Deseret Mutual employees because he had opposed Mrs. Gardner's termination.  *Id*. at 203:5-10.

The Gardners contacted Bob and a meeting was held on August 23, 2013, regarding Mrs. Gardner's termination and the growing hostility directed toward Mr. Gardner for opposing Mrs. Gardner's termination.  *Id.* at 86:24-25 and 87:1-18.  On or about August 29, 2013, Mr. Gardner had another meeting with Scott and Bob where he was informed that they were considering moving him to another department because Mr. Gardner "felt there was some hostility towards [him]." *Id.* at 202:21-25 and 203:1-2.  Mr. Gardner was then placed on leave until it was decided to which department he would be moved.  *Id.* at 88:22-25.  Mr. Gardner's facebook post was not discussed nor given as a reason for moving Mr. Gardner into a different department.  *Id.* at 88:12-25.  On September 5, Mr. Gardner was allowed to choose between three departments.  *Id.* at 90:3-8 and 209:12-14.  Mr. Gardner was given time to consider where he wanted to go. *Id*. at 209:15-16.  The next day, Mr. Gardner informed Deseret Mutual of his choice.  *Id.* at 209:16-19.  Deseret Mutual replied "Great. I'll go ahead and get with Brad and Layne and let them know."  *Id.* at 91:5-7 and 209:23-24.  However, Deseret Mutual later revised its position and stated that "we've decided that until Yohana's issue is resolved you will not be returning."  *Id.* at 210:10-12.  A copy of the Deseret Mutual's email

correspondence to Mr. Gardner, dated September 9, 2013 is attached hereto as Exhibit "J."

On October 1, 2013, the parties met with their respective counsel to discuss a possible settlement. Ex. A at 210:20-25. The first time, Deseret Mutual raised an issue about the facebook post was in a letter sent to the Gardner's legal counsel on October 7, 2013. A copy of the October 7, 2013, letter is attached hereto as Exhibit "K." In the October 7, 2013, letter, sent through counsel, Deseret Mutual indicated that it was going "to consider Mr. Gardner's continued employment based on its budgetary needs and its comfort level with Mr. Gardner's behavior on a go-forward basis." *Id*. Mr. Gardner viewed this statement as pretext for terminating him for opposing his wife's termination. Ex. A at 221:22-25 and 222:1-7. The timing in which the facebook post was eventually raised (i.e. for the first time on October 7) corroborates Mr. Gardner's conclusion that the facebook post was being utilized as a pretext for his termination. Mr. Gardner remained on paid administrative leave until October 30, 2013, when Mr. Gardner was informed that his employment would be terminated on October 31, 2013. *Id.* at 211:23-25 and 212:1-6. The evidence shows that Deseret Mutual was not concerned about Mr. Gardner's post but that they were concerned about his opposition to Mrs. Gardner's termination and were hostile to Mr. Gardner for opposing her termination.

The only evidence before the Court is that on August 5, Mr. Gardner made a post on facebook which he removed almost immediately after. *Id.* at 173:22-25. As set forth in response to Statement of Fact 31, Gardners dispute that the facebook post was related to or directed at Desert Mutual or any of its employees. After Mr. Gardner removed the post, Deseret Mutual acknowledged that the matter was resolved and no further action was taken. *Id.* at 174:13-22. The post was not raised again until October 7, a time lapse of more than two months. Mr. Gardner's one time post on facebook does not constitute erratic behavior. Ms. McReavy's and Ms. Bishop's Declaration merely provide that their relationship with Mr. Gardner was strained because of Mr. Garder's engaging in protected activity.

**Deseret Mutual Response:** This lengthy response simply asserts conclusions or irrelevant facts. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 34.** However, that was not the case-Mr. Gardner's co-workers were terrified of working with him, and continued to express their fears to Deseret Mutual management. *Id.* at ¶ 14; Declaration of Allison Bishop at ¶¶11-15 (testifying that he was "hostile" and "critical" of her job performance despite having no supervisory authority over her).

**Gardners' Response to Statement of Fact 34.**   Gardners dispute that Mr. Gardner's co-workers were terrified of working with him and expressed their fears to Deseret Mutual's management.  See Gardners' Response to Statement of Fact 30 and 32.  Other than the conclusory statements that Mr. Gardner's co-workers expressed fears relative to Mr. Gardner, Deseret Mutual does not identify any individual nor provide evidence to support this statement.  Mr. Eastmond, and Ms. Bishop do not have personal knowledge of the fears of Mr. Gardner's co-workers and cannot testify to such fears.

As support for her statement that she is "terrified in any interaction with [Mr. Gardner], Ms. Bishop cites that "he was critical of [her] job performance and seemed to be watching to see if I made mistakes" and during a meeting "Mr. Gardner wrote a large message to himself…that '[Allison] didn't bring the thought."  This does not support the claim that Ms. Bishop was reasonably terrified of Mr. Gardner and only adds support that the rationale set forth for Mr. Gardner's termination is a pretext.

**Deseret Mutual Response:**  This response is conclusory and does not contain facts supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").  Mr. Gardner has no basis to challenge the cited declarations.

**Deseret Mutual's Statement of Fact 35.**   Mr. Gardner eventually conceded that he was having trouble with his co-workers.  *Declaration of Scott Eastmond* at ¶15.

**Gardners' Response to Statement of Fact 35.**   Gardners   do   not dispute that Mr. Gardner was having issues with his co-workers.  However, those issues were directly related to Mr. Gardner engaging in protected activity and opposing his wife's discriminatory termination, not the facebook post.  See Gardners' Response to Statement of Fact 33.  After Mr. Gardner opposed his wife's termination because he believed she had been discriminated on the basis of race, gender and FMLA, Mr. Gardner's co-workers and supervisors began to show hostility toward him because of his opposition.  Ex. A at 86:20-25 and 87:1-18.  As soon as it became known that Mr. Gardner was opposing his wife's termination "it was like the faucet was turned off.  [Mr. Gardner] no longer had communications, [he] felt on an island.  Despite multiple projects [he] was running [he] felt [he] couldn't even leave [his] office to use the restroom without being questioned why." *Id.* at 84:8-18.  Among other things, Ms. Bishop refused to look at Mr. Gardner when she spoke to him, Jana no longer spoke cordially to him.  *Id.* at 93:12-19. Donna, who had previously been very friendly made a complete change of attitude toward him.  *Id.* at 102:2-13.  His co-workers began finding ways of circumventing

him and removing him from the picture.  *Id.* at 96:21-24; 97:21-23; 138:16-25; and 139:1-4.  Mr. Gardner was denied assignments and supervisory roles that had been his in the past, such as the VSP project.  *Id.* at 85:12-23.

**Deseret Mutual Response:**  Mr. Gardner admits the fact, and the remaining response is conclusory and does not contain facts supported by admissible evidence.   *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

> **Deseret Mutual's Statement of Fact 36.**    Mr. Eastmond proposed placing Mr. Gardner on paid administrative leave while Deseret Mutual determined the best way to deal with its employees' fears of Mr. Gardner, and Mr. Gardner readily accepted. *Id.* at ¶¶ 16-17; *Gardner Depo* at 136:14-25, attached hereto as Exhibit B-14.

> **Gardners' Response to Statement of Fact 36.**    Gardners dispute that the reason Mr. Gardner was placed on administrative leave was because of employee's fears about Mr. Gardner.  See Gardners' Response to Statement of Fact 33.  During the August 29, 2013, Mr. Gardner, Mr. Eastmond and Bob discussed Mrs. Gardner's termination and the hostility directed toward Mr. Gardner as a result of his opposition.  Bob and Mr. Eastmond proposed that Mr. Gardner be moved to a different department and offered him gifted paid leave while he decided which department would suit him best.  Ex. A at 88:22-25; 202:21-25; and 203:1-2.  At that meeting Mr. Gardner's facebook post was not discussed or given as the reason for the paid leave.  Ex. A at 88:12-25 and Ex. B at ¶14.  It was not until approximately October 7th that Deseret Mutual, through legal counsel, first referenced Mr. Gardner's August 5th facebook post. Ex. A at 20-25 and Ex. K. The evidence shows that Mr. Gardner was placed on leave while it was decided to which department he would be moved as a result of the hostility he felt for opposing his wife's termination.

**Deseret Mutual Response:**  This response is conclusory and does not contain facts supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact."). It further ignores the evidence and declarations submitted by Deseret Mutual.

**Deseret Mutual's Statement of Fact 37.**     Based on the concerns expressed by employees and managers in the Enrollment and Customer Service teams, Deseret Mutual did not believe it could return Mr. Gardner to work as Manager of Enrollment and Retirement because of the threats made in his Face book message. *Declaration of Scott Eastmond* at ¶18.

 **Gardners' Response to Statement of Fact 37.**     Gardners dispute that Deseret Mutual terminated Mr. Gardner's employment based on his facebook post. See Gardners' Responses to Statements of Fact 30-34. Mr. Gardner was terminated because he opposed the wrongful termination of his wife. On August 23rd and 29th Mr. Gardner had meetings with Scott and Bob discussing Mrs. Gardner's termination and the hostility directed toward Mr. Gardner as a result of his opposition to Mrs. Gardner's termination. Ex. A at 86:24-25; 87:1-18; 202:21-25; and 203:1-2. At the conclusion of the August 29th meeting, Mr. Garden was placed on leave while he decided which department to choose. *Id.* at 88:22-25; 202:21-25; and 203:1-2. After informing Deseret Mutual of his chosen department, Mr. Gardner sent a follow up email to Scott, who responded that "we've decided that until Yohana's issue is resolved you will not be returning." *Id.* at 210:10-12. Neither the facebook post nor the fears of his co-workers were given as the reason for his leave or their determination not to allow him to return. *Id.* at 88:12-25 and Ex. B at ¶11. It was not until approximately October 7th that Deseret Mutual, through legal counsel, first referenced Mr. Gardner's August 5th facebook post. Ex. A at 20-25 and Ex. K. Mr. Gardner reasonably viewed Deseret Mutual's statements as pretext for terminating him for opposing his wife's termination. Ex. A at 221:122-25 and 221:1-7.

 **Deseret Mutual Response:**  This response is conclusory and does not contain facts supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact."). It further ignores the evidence and declarations submitted by Deseret Mutual.

 **Deseret Mutual's Statement of Fact 38.**     Deseret Mutual did not consider it appropriate for Mr. Gardner to publicly threaten co-workers on Facebook. *Id.* at ¶19.

 **Gardners' Response to Statement of Fact 38.**     Gardners dispute that Mr. Gardner's facebook post was or could be viewed as a threat or that it was directed toward Deseret Mutual's employees. See Gardners' Response to Statement of Fact 31.

**Deseret Mutual Response**:  This response is conclusory and does not contain facts supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 39.**   Additionally,   Deseret   Mutual employees indicated that they had serious concerns about working with Mr. Gardner because they feared for their personal safety at work and at home. *Id.* at ¶20; *Declaration of Donna McReavy* at ¶20; *Declaration of Allison Bishop* at ¶¶9, 15.

**Gardners' Response to Statement of Fact 39.**   Gardners dispute that Deseret Mutual employees expressed concerns about working with Mr. Gardner or feared for their personal safety.  See Gardners' Responses to Statements of Fact 30 and 34.

**Deseret Mutual Response:**  This response is conclusory and does not contain facts supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").  It further ignores the evidence and declarations submitted by Deseret Mutual.

**Deseret Mutual's Statement of Fact 40.**   However,   in   Deseret   Mutual's communications with Mr. Gardner, he refused to acknowledge that his Facebook post was the source of conflict with his co-workers, and would not provide any reassurance that he would refrain from such behavior when he returned to work. *Declaration of Scott Eastmond* at ¶21.

**Gardners' Response to Statement of Fact 40.**   Mr. Gardner does not dispute that he does not believe the facebook post is the source of conflict with his co-workers.  Mr. Gardner acknowledges that the source of conflict with his co-workers is his opposition to Mrs. Gardner's termination.  See Gardners' Responses to Statements of Fact 33 and 35.

The Gardners dispute that Mr. Gardner refused to provide assurances that he would refrain from such behavior when he returned to work.  As set forth in Gardners's Response to Statement of Fact 31, the facebook post was not a threat and was not directed at Deseret Mutual or its employees.  Soon after making the post to facebook, Mr. Gardner was contacted by Jana Sybrowsky about the post.

Ex. A at 173:22-23.  Mr. Gardner did not intend, believe or realize the post could be construed as directed at Deseret Mutual.  *Id*. at 175:16-18.  Mr. Gardner immediately removed the post from facebook.  *Id*. at 173:24-25.  Mr. Gardner also notified Scott and Bob about the post.  *Id*. at 174:9-11.  Mr. Gardner's actions demonstrate that he did not intend the post to be directed at Deseret Mutual or its employees or that any such post would occur in the future.

**Deseret Mutual Response:**  This response is conclusory and does not contain facts supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 41.**   In   September,   Deseret   Mutual arranged a meeting with the Gardners to discuss Mr. Gardner's continued employment with Deseret Mutual. *Id.* at ¶22.

**Gardners' Response to Statement of Fact 41.**   The Gardners do not dispute that on or about September 5, 2013, Mr. Gardner met with Scott about moving to a different department because of the hostility directed at Mr. Gardner for opposing his wife's termination.  *Id*. at 202:21-25 and 203:1-2.

**Deseret Mutual Response:** Mr. Gardner does not dispute this fact, but adds conclusory facts to it, without citation to any evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 42.**   Represented by counsel, the parties met and negotiated a resolution that included transferring Mr. Gardner to another division of the company where he would not directly interact with the associates on the Enrollment or Customer Service teams. *Id.* at ¶¶23, 25.

**Gardners' Response to Statement of Fact 42.**   The Gardners dispute that during the September meeting the parties were represented by counsel.  Only Scott and Mr. Gardner were present at the meeting on or about September 5, 2013.  *Id.* at 89:7-8.  The Gardners did not retain legal counsel until after September 10, 2013.  *Id*. at 91:21-25 and 92:1-9.  The Gardners dispute that the reason for the move was for so that Mr. Gardner would not directly interact with associates on the

Enrollment or Customer Service teams.  Rather, the reason for the move was to remove Mr. Gardner from the hostile environment that he was in due to his opposition to Mrs. Gardner's termination. *Id*. at 202:21-25 and 203:1-2. See also Gardners' Response to Statement of Fact 33.  This is confirmed by Deseret Mutual's statement that "we've decided that we're not going to allow you to return until we've corrected this issue with Yohana, we've come to a resolution with Yohana."  Ex. A at 91:23-25 and 92:1 and Ex. J.+.

**Deseret Mutual Response:**  Mr. Gardner seems to misread Fact 42 and disputes facts that are not asserted.  The meeting referenced in Deseret Mutual's Fact No. 42 occurred on October 1, 2013, during which the parties discussed and agreed to transfer Mr. Gardner to a new position in the company. *See Docket No. 17-1, Declaration of Scott Eastmond* at ¶¶23, 25.  Deseret Mutual never rescinded that offer—rather, Mr. Gardner first accepted, then rejected, that transfer and demanded "to return to his same position right away." *See Deseret Mutual's Statement of Fact No. 44, infra.* The remaining statements are unsupported conclusions. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 43.**    Deseret Mutual believed this transfer was necessary in order to reduce its employees' concerns about the Facebook threat. *id.* at ¶24.

**Gardners' Response to Statement of Fact 43.**    Gardners dispute that the transfer was necessitated by employees' concerns about Mr. Gardner's facebook post.  The transfer was suggested as a means of removing Mr. Gardner from the hostile work environment he was in due to his opposition to Mrs. Gardner's termination. *Id*. at 202:21-25 and 203:1-2.  This is confirmed by the fact that the reason given for not transferring Mr. Gardner was that Deseret Mutual decided that "we've decided that we're not going to allow you to return until we've corrected this issue with Yohana, we've come to a resolution with Yohana." *Id*. at 91:23-25; 92:1; and 210:9-12.  The Gardners also dispute that Deseret Mutual's employees were concerned about the facebook post.  See Gardners' Responses to Statements of Fact 30-34, 36, 37, and 39.

23

**Deseret Mutual Response:**   This response is conclusory and does not contain facts supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Deseret Mutual's Statement of Fact 44.**   However, only a few days later, the Gardners' counsel withdrew his acceptance of this resolution and indicated that "Mr. Gardner wishes to return to his same position right away." *See Email from Tracy L. Olson dated October 3, 2013,* attached hereto as Exhibit H.

**<u>Gardners' Response to Statement of Fact 44.</u>**   The Gardners dispute that Mr. Gardner rejected the offer to move Mr. Gardner to a different department. Deseret Mutual misrepresents the nature and circumstances of the withdrawal of the offer to transfer Mr. Gardner.  On or about August 29, 2013, Mr. Gardner had a meeting with Scott and Bob strictly about the hostility that was directed at Mr. Gardner because of his opposition to his wife's termination.  Ex. A at 206:17-20. During that meeting, Mr. Gardner was informed that Deseret Mutual was considering moving him to another department because he "felt there was some hostility towards [him]."  *Id.* at 202:21-25 and 203:1-2.  On September 5, Deseret Mutual told Mr. Gardner that he could move to one of three departments and gave him time to consider his decision.  *Id.* at 90:3-8 and 209:12-16.  The next day, Mr. Gardner informed Deseret Mutual of his choice.  *Id.* at 90:23-25; 91:1-3; and 209:16-19.  Scott responded "Great. I'll go ahead and get with Brad and Layne and let them know."  *Id.* at 91:5-7 and 209:23-24.  However, on September 9, Deseret Mutual informed Mr. Gardner that he "would not be returning."  *Id.* at 91:21-25; 92:1; 210:10-12 and Ex. J.  It was not Mr. Gardner who refused the transfer, it was Deseret Mutual.

On October 1, 2013, the parties met with their respective counsel to discuss a possible settlement.  *Id.* at 210:20-25.  At that meeting Deseret Mutual made a cash settlement offer to the Gardners.  *Id.* at 211:2-5.  After the meeting the Gardners discussed the settlement offer and decided that they did not want to take the settlement offer and on October 3, 2013, through counsel, they rejected the settlement offer.  *Id.* at 211:2-6, 16-20.  Thus, the October 3, 2013, email is a rejection of a separate offer of cash settlement, not the offer to transfer Mr. Gardner to a different department.

The Gardners did not reject the offer to transfer Mr. Gardner to a different department.  Mr. Gardner accepted that offer, Deseret Mutual determined not to transfer Mr. Gardner until it had worked out the issues regarding Mrs. Gardner's claims and Mr. Gardner's opposition to his wife's termination.

**Deseret Mutual Response:**  This response does not meet the substance of the fact.  It appears to assert that Mr. Gardner first accepted Deseret Mutual's offer to transfer to another division.  However, it is undisputed that Mr. Gardner's attorney asserted that Mr. Gardner intended to return to "his same position right away" as set forth in Fact 44.

**Deseret Mutual's Statement of Fact 45.**   On October 4, 2013, Deseret Mutual's counsel responded to this demand and informed Gardners' counsel that Mr. Gardner would remain on paid administrative leave while it continued to assess the issues with Mr. Gardner's Facebook threat. *Gardner Depo* at Exhibit 19, attached hereto as Exhibit I.

**<u>Gardners' Response to Statement of Fact 45.</u>**   Gardners dispute that the October 4, 2013, letter provided that Deseret Mutual was going to assess issues regarding the facebook post.  Deseret Mutual misstates the contents of the October 4, 2013, letter.  The letter speaks for itself and provides that
In regards to Mr. Gardner's withdrawal and stated intention to return to work at DMBA, our client will continue Mr. Gardner's paid administrative leave through the end of October, 2013.  DMBA is currently exploring how best to handle the unique issues presented by Mr. Gardner's situation.

A copy of the October 4, 2013, letter is attached hereto as Exhibit "L."  The October 4th letter does not mention the facebook post.  *Id.*  It merely states that Deseret Mutual will explore how to handle the "unique issues."  *Id.*

**Deseret Mutual Response:**  Deseret Mutual agrees that the letter speaks for itself and asserts that this purported dispute is not material.

**Deseret Mutual's Statement of Fact 46.**   On October 7, Deseret Mutual sent another letter to Gardners' counsel, which highlighted that it had "serious concerns regarding Mr. Gardner's workplace behavior following the termination of Mrs. Gardner. It is critical to DMBA that Mr. Gardner appreciate that his inappropriate Facebook post ... [was] not acceptable to DMBA." *Gardner Depo* at Exhibit 20, attached hereto as Exhibit J.

**<u>Gardners' Response to Statement of Fact 46.</u>**   The Gardners do not dispute that in the October 7, 2013, letter Deseret Mutual indicated that it had concerns regarding Mr. Gardner.  Deseret Mutual also stated that "this concern may be exacerbated as a consequence of the actions his wife may or may not take against DMBA for termination of her employment."  See Exhibit G.  Deseret Mutual

appears to <u>admit</u> that its actions against Mr. Gardner are in response to potential action by Mrs. Gardner against Deseret Mutual for her termination. This, in and of itself, is strong and sufficient evidence of retaliation by Deseret Mutual against Mr. Gardner for engaging in protected activity such that the Court could grant partial summary judgment against Deseret Mutual and in favor of Mr. Gardner on the issue of liability.

Deseret Mutual goes on to state that it "will continue to consider Mr. Gardner's continued employment based on its budgetary needs and its comfort level with Mr. Gardner's behavior on a go-forward basis." Accordingly, Mr. Gardner's future employment was contingent on budget and behavior. It is unclear whether the behavior that they refer to includes his opposition to Mrs. Gardner's termination. Mr. Gardner viewed the statements in the October 7 letter as pretext for terminating him for opposing his wife's termination. *Id.* at 221:122-25 and 221:1-7.

**Deseret Mutual Response:** There is no dispute to this fact. Mr. Gardner's request for the Court to grant partial summary judgment is improper and the argument set forth above should be disregarded by the Court.

**Deseret Mutual's Statement of Fact 47.** Deseret Mutual emphasized that, "[t]o be clear, Mr. Gardner's return to work cannot unduly disrupt the work environment or other employees." *Id.*

**<u>Gardners' Response to Statement of Fact 47.</u>** The Gardners do not dispute that the October 7, 2013, letter contains that statement. The Gardners dispute the implication that this was the reason for Mr. Gardner's continued paid administrative leave and ultimate termination. As set forth in the Gardners' Responses to Statements of Fact 32-33, Mr. Gardner's behavior was not disruptive; rather, it was the hostile work environment created by Deseret Mutual and directed at Mr. Gardner that was problematic. Mr. Gardner viewed these statements in the October 7th letter as pretext for terminating him for opposing his wife's termination. Ex. A at 221:122-25 and 221:1-7.

**Deseret Mutual Response:** Mr. Gardner did not dispute this fact.

**Deseret Mutual's Statement of Fact 48.** Deseret Mutual expressed its concern that "Mr. Gardner is unwilling to sign an acknowledgment and release reflecting his understanding of these issues." *Id.*

**<u>Gardners' Response to Statement of Fact 48.</u>** See Gardners' Response to Statement of Fact 40. While Plaintiff disputes Statement of Fact 48,

such fact is irrelevant and immaterial to the burden shifting element under a Title VII or FMLA retaliation claim.

**Deseret Mutual Response:**  Mr. Gardner's purported dispute is not supported by any citation to authority, and should be disregarded.

**Deseret Mutual's Statement of Fact 49.**    Deseret Mutual then indicated that it would like to speak with Gardners' counsel regarding these issues, requested a time for a telephone call, and stated that Mr. Gardner would remain on paid administrative leave through the end of October, 2013.

**Gardners' Response to Statement of Fact 49.**    The Gardners dispute that Deseret Mutual's attempt to arrange a telephone call or that Mr. Gardner would remain on paid administrative leave is relevant or material to the burden shifting element of a Title VII or FMLA retaliation claim.  Whether or not the parties had a telephone call has no bearing on the legitimacy of Deseret Mutual's termination of Mr. Gardner.  Similarly, that Mr. Gardner's paid administrative leave would continue has no bearing on the legitimacy of Deseret Mutual's termination of Mr. Gardner.  It should be noted that on October 4, 2013, the Gardner's counsel Mr. Olson notified Deseret Mutual that he no longer represented the Gardners.  A copy of Mr. Olson's letter is attached hereto as Exhibit "M." See also Ex. A at 211:16-20.

**Deseret Mutual Response:**  Mr. Gardner's purported dispute is not supported by any citation to authority, and should be disregarded.  Further, the date referenced for the withdrawal of Mr. Gardner's counsel is inaccurate.  Deseret Mutual received notice of the withdrawal on November 4, 2013.  *See Deseret Mutual's Statement of Fact 51.*

**Deseret Mutual's Statement of Fact 50.**    Deseret Mutual never received a response to this letter. *Declaration of Scott Eastmond* at ¶26.

**Gardners' Response to Statement of Fact 50.**    The fact that Deseret Mutual did not receive a response to the October 7th letter is irrelevant and immaterial to the burden shifting element of a Title VII or FMLA retaliation claim. And, it is irrelevant and immaterial to the question of whether or not Deseret Mutual had a legitimate basis for terminating Mr. Gardner.

**Deseret Mutual Response:**  Mr. Gardner did not dispute this fact.

27

**Deseret Mutual's Statement of Fact 51.**    On November 4, 2013, Gardners' counsel notified Deseret Mutual that he was no longer representing the Gardners. *Gardner Depo* at Exhibit 21, attached hereto as Exhibit K.

    <u>**Gardners' Response to Statement of Fact 51.**</u>    This alleged fact is immaterial and irrelevant to Deseret Mutual's allegation that they had a legitimate basis for terminating Mr. Gardner.

**Deseret Mutual Response:**  Mr. Gardner did not dispute this fact.

**Deseret Mutual's Statement of Fact 52.**    Deseret Mutual terminated Mr. Gardner's employment at the Company on October 31, 2013 after his paid administrative leave expired without any further attempt on his part to discuss or reach an acceptable resolution for the situation created by his Facebook post. *Declaration of Scott Eastmond* at ¶27.

    <u>**Gardners' Response to Statement of Fact 52.**</u>    The Gardners dispute that Mr. Gardner was terminated for failure to resolve the situation created by the facebook post.  See Gardners' Responses to Statements of Fact 30-33, 36-37, 40, and 48.  The facebook post was not a threat and was not directed at Deseret Mutual or its employees.  Ex. H.  Soon after making the post to facebook, Mr. Gardner was contacted by Jana Sybrowsky about the post.  Ex. A at 173:22-23.  Mr. Gardner did not intend, believe or realize the post could be construed as directed at Deseret Mutual.  *Id.* at 175:16-18.  Mr. Gardner immediately removed the post from facebook.  *Id.* at 173:24-25.  The next day, August 6, Mr. Gardner again met with Jana who told him that he had handled things right.  *Id.* at 174:13-22.  After that meeting with Jana, no further action was taken with respect to the facebook post, nor was it discussed again, until this litigation.  Ex. B at ¶12.  It was not until approximately October 7th that counsel for Deseret Mutual, first referenced Mr. Gardner's August 5th facebook post.  Ex. A at 20-25 and Ex. K.

    The situation was not created by Mr. Gardner's facebook post.  The situation was created by Mr. Gardner opposing Mrs. Gardner's termination and the hostilitiy that was directed at Mr. Gardner as a result of his opposition.  After Mr. Gardner opposed his wife's termination, his co-workers began to show hostility toward him because of his opposition.  Ex. A at 86:20-25 and 87:1-18.  As soon as his opposition became known "it was like the faucet was turned off.  [Mr. Gardner] no longer had communications, [he] felt on an island.  Despite multiple projects [he] was running [he] felt [he] couldn't even leave [his] office to use the restroom without being questioned why."  *Id.* at 84:8-18.  After he opposed Mrs. Gardner's termination, among other things, Ms. Bishop refused to look at Mr. Gardner when she spoke to him, Jana no longer spoke cordially to him.  *Id.* at 93:12-19.  Donna, who had previously been very friendly made a complete change of attitude toward him.  *Id.* at 102:2-13.  His co-workers began finding ways of circumventing him

and removing him from the picture.  *Id.* at 96:21-24 and 97:21-23.  Mr. Gardner was denied assignments and supervisory roles that had been his in the past, such as the VSP project.  *Id.* at 85:12-23.

Based on this growing hostility due to his opposition of Mrs. Gardner's termination, on August 23, 2013, and again on August 29, 2013, the Gardners had meetings with Scott and Bob.  *Id.* at 86:24-25; 87:1-18; 202:21-25 and 203:1-2.  At these meetings Deseret Mutual suggested moving Mr. Gardner to another area "because [Mr. Gardner] had mentioned to them in that meeting that [he] felt there was some hostility towards [him]."  *Id.* at 202:21-25 and 203:1-2.  Deseret Mutual then placed Mr. Gardner on leave until they decide to which department he would be moved.  *Id.* at 88:22-25.  There was no discussion of Mr. Gardner's facebook post nor was it given as a reason for moving Mr. Gardner into a different department.  *Id.* at 88:12-25 and Ex. B at ¶11.  The next day, Mr. Gardner informed Deseret Mutual of his choice.  Ex. A at 90:23-25; 91:1-3; and 209:16-19.  Scott responded "Great. I'll go ahead and get with Brad and Layne and let them know."  *Id.* at 91:5-7 and 209:23-24.  Subsequently, Scott emailed Mr. Gardner and stated that "after further consideration this morning . . . we want to emphasize a desire to resolve both sides of this equation (i.e., both your situation and Johana's [*sic*]) at the same time. . . . Bob and I believe it is in everyone's best interest to achieve resolution of these issues before you return."  Ex. J.  In other words, as Mr. Gardner put it "we've decided that we're not going to allow you to return until we've corrected this issue with Yohana, we've come to a resolution with Yohana."  Ex. A at 91:23-25; 92:1; and 210:9-12.  Accordingly, the situation was created by Mr. Gardner's opposition to his wife's termination, not the facebook post.

**Deseret Mutual Response:**  This response is a conclusion and not a fact supported by admissible evidence.  It is undisputed that additional discussions occurred between the parties regarding bringing Mr. Gardner back to work.  *See Deseret Mutual's Statement of Fact 42-44.*  It is also undisputed that Mr. Gardner stopped communicating with Deseret Mutual after October 7, 2013.  *See id. at Fact 50.*

### STATEMENT OF ADDITIONAL ELEMENTS AND ADDITIONAL FACTS
### Elements of Breach of Contract

**Concise Statement of Additional Material Facts Regarding Elements of Breach of Contract:**

53.     Mr. Gardner was a manager and supervisor of employees, had hiring and firing power, and was well versed in Deseret Mutual's employment practices,

hiring and discipline practices, and the manner in which it treated the employee handbook as binding on its employees and supervisors.  Ex. A at 11:10-25; 12:1-25; 13:1-23; 83:11-17; and 158:15-19.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

54.        Deseret Mutual always followed its disciplinary process set out in its Associate Handbook, Administrative Policies, and HR Policy Manual by first giving a verbal warning, then a written warning, then discipline and finally termination.  *Id.* at 83:9-17.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

55.        Mr. Gardner, an enrollment retirement manager for Deseret Mutual, stated that Deseret Mutual always followed this procedure.  *Id.* at 13:20-23 and 83:9-17.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

56.        Desert Mutual's HR Policy provides that:

It is the policy of Deseret Mutual that associates should have an opportunity to present their work-related complaints and to appeal management decisions through a dispute resolution procedure. Deseret Mutual will attempt to resolve promptly all disputes that are appropriate or handling under this policy

See Section 904, a copy of which is attached hereto as Exhibit "N."

**Deseret Mutual Response:**  The HR Policy speaks for itself.

57.     Deseret Mutual deems "a belief that Deseret Mutual policies, practices, rules, regulations, or procedures have been applied inconsistently to an associate" to be a proper dispute.  *Id.*

**Deseret Mutual Response:**  The HR Policy speaks for itself.

58.     It also deems reprisal and harassment, and discrimination to be proper disputes.  *Id.*

**Deseret Mutual Response:**  The HR Policy speaks for itself.

59.     The HR Policy further provides that "Associates are not to be penalized for proper use of the dispute resolution procedure…associates and managers are prohibited from retaliating against an associate who properly used the dispute resolution procedure."  *Id.*

**Deseret Mutual Response:**  The HR Policy speaks for itself.

60.     Deseret Mutual closely followed its disciplinary procedures and practices in the HR Policy Manual.  Ex. A at 158:15-19.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

61.     Deseret Mutual treated its Associate Handbook, Administrative Policies, and HR Policy Manual as an implied contract.  Ex. B at ¶16.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

62.     Mr. Gardner did not receive any verbal or written warning about his conduct.  *Id.* at ¶17.

**Deseret Mutual Response:**   This fact should be disregarded under the Sham Affidavit Rule.   *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").   Specifically, Mr. Gardner's own facts detail the verbal warning he received regarding the Facebook post.   *See Statement of Additional Elements and Additional Facts at 186.*

63.      Mr. Gardner did not receive any disciplinary action.   *Id.* at ¶18.

**Deseret Mutual Response:**   This fact should be disregarded under the Sham Affidavit Rule.   *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").   Specifically, numerous meetings and emails with Deseret Mutual management and meetings with attorneys are detailed in Mr. Gardner's own facts and deposition testimony.   *See Statement of Additional Elements and Additional Facts at 159, 160, 195,* and *Deposition of Bryce Gardner* at 174:13-22 (testifying that when he met with Jana Sybrowsky about the Facebook post, "[s]he had a piece of paper flipped over on her desk, which I can only assume was a termination document").

64.      Mr. Gardner was simply terminated because he opposed his wife's termination.   *Id.* at ¶19.

**Deseret Mutual Response:**   This is a conclusion and not a fact supported by admissible evidence.   *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Elements of a claim of Breach of Covenant of Good Faith and Fair Dealing**

**Concise Statement of Additional Material Facts Regarding Elements of Breach of Covenant of Good Faith and Fair Dealing:**

    **65.**        Gardners incorporate additional facts 53 through 64 above.

    **66.**        Deseret Mutual always followed the same disciplinary process of first giving a verbal warning, then a written warning, then discipline and finally termination.  Ex. A at 83:9-17.

    **Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**Elements of a Claim of Retaliation under FMLA and Title VII:**

    [*Text Omitted*]

**Concise Statement of Additional Material Facts Regarding Element One of a Claim of Retaliation under FMLA or Title VII:**

    **67.**        After being hired and as soon as her training was complete, Mrs. Gardner, a native Spanish speaker, began asking if she could take Spanish calls. Ex. C at 64:6-7.

    **Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **68.**        However, Deseret Mutual refused to allow Mrs. Gardner, a native Spanish speaker, to taking Spanish telephone calls.  *Id.* at 64:6-12 and Ex. A at 80:16-25 and 81:1-11.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

      69.      At the same time, Deseret Mutual permitted non-native speakers who were hired at the same time as Mrs. Gardner, namely Chad Loveland and Cameron Solt, to take Spanish from the beginning.  Ex. C at 65:17-25; 66:1-5 and Ex. A at 80:16-25 and 81:1-11.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

      70.      Employees who take Spanish calls receive a salary increase.  Ex. C at 68:4-11.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

      71.      Mr. Gardner was aware that Mrs. Gardner was not being treated the same as her co-workers.  Ex. A at 80:16-25 and 81:1-11.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

      72.      Mr. Gardner was aware that Mrs. Gardner was on a committee that was referred to as the "Hispanic committee" or the "brown committee."  *Id.* at 24:6-8, 21-25.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **73.**       During her employment, Mrs. Gardner attempted to apply for a promotion that was being offered by Deseret Mutual. Ex. C at 76:3-13.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **74.**       Allison Bishop, Mrs. Gardner's supervisor, told Mrs. Gardner that she could not apply for the promotion because she had not been employed for more than one year.  *Id.* at 76:13-15.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **75.**       However, Chad Loveland, an employee hired the same day as Mrs. Gardner received the promotion.  *Id.* at 76:17-18.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **76.**       The Gardners felt that Mrs. Gardner was being discriminated against and was receiving disparate treatment both because she was a minority and because she was pregnant and had applied for FMLA accomodation [sic]. Ex. A at 25:11-16 and 42:6-8 and Ex. C at 86:12-15.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **77.**     Mr. Gardner was aware that Mrs. Gardner was a good employee. Ex. A at 22:8-13 and Ex. C at 147:24-25.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.  This fact is also a conclusion and not supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

    **78.**     She received emails from customers complimenting her work performance.  Ex A at 22:8-13.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **79.**     She hit the numbers her supervisors demanded.  *Id.* at 22:8-13.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

    **80.**     Mrs. Gardner received emails from her team leader, Kerri, telling her that she had done a good job on her calls.  Ex. C at 148:6-7.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **81.**      During her employment, Mrs. Gardner received an award for taking in the most walk-ins of her team.  *Id.* at 148:7-9.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **82.**      She also received awards based on customer responses. *Id.* at 148:10-12.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **83.**      Mrs. Gardner became pregnant in approximately May of 2013.  *Id.* at 116:20-22.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **84.**      Mrs. Gardner gets really sick when she is pregnant.  *Id.* at 117:12-13.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

85.    Immediately after becoming pregnant Mrs. Gardner began getting sick.  *Id.* at 116:23-25.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

86.    Mrs. Gardner would throw up approximately three or four times a day, and it was necessary for her to spend additional time in the bathroom.  *Id.* at 177:1-9.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

87.    Due to her pregnancy, Mrs. Gardner would get sick and needed to use the bathroom more frequently in order to vomit.  *Id.* at 177:3-9.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

88.    Mrs. Gardner became especially sick in the mornings, she felt fatigue and irritability.  Ex. A at 34:2-4.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

89.     In fact, due to the pregnancy at issue in this matter, Mrs. Gardner became so sick that she had to be hospitalized and receive IV treatment therapy in order to restore fluids to her body because she was throwing up so much.  Ex. C at 117:19-21.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA and further misstates testimony.  Ms. Gardner was not hospitalized until October or November of 2013, months after her termination.  *See Deposition of Yohana Gardner* at 117:22-24.

90.     On July 8, 2013, Mrs. Gardner submitted a Request for Family or Medical Leave to Deseret Mutual due to her pregnancy.  Ex. E.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

91.     Her request was granted on July 12, 2013.  Ex. F

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

92.     After Mrs. Gardner announced her pregnancy, her supervisor's behavior toward Mrs. Gardner became hostile and harassing.  Ex. C at 183:18-22.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

93.      Mr. Gardner saw Mrs. Gardner had a good relationship with her supervisors prior to her pregnancy and even invited them to her wedding.  *Id.* at 37:20-22; 40:1-5; and 41:7-12.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

94.      After announcing her pregnancy, Mr. Gardner saw that his wife's supervisors attitude changed and they began treating her poorly, and avoiding her whenever they could.  Ex. A at 40:12-19; 42:6-19; 46:23-25; 47:1-7; 49:22-25; and 50:1-5..

**Deseret Mutual Response:**  This fact should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  Mr. Gardner testified that Ms. Gardner was allegedly treated differently from her coworkers beginning in January or February, 2013, months before she was pregnant.  *Deposition of Bryce Gardner* at 42:6-8.

95.      Mr. Gardner saw that Mrs. Gardner was being prevented from using the bathroom for her pregnancy related sickness.  *Id.* at 27:13-16.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.  This fact also should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  Mr. Gardner did not testify that he had any personal knowledge of Ms. Gardner allegedly being prevented from using the bathroom.  The citation to the record is based on information conveyed to him by Ms. Gardner.

     96.     Her supervisors would praise other employees who met their numbers or were top performers; however, no such praise or recognition was given when Mrs. Gardner met her numbers or was the top performer.  *Id.* at 26:3-9, 17-20.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     97.     Her supervisors began harassing her about the number of bathroom breaks she was taking, in spite of knowing her medical reasons for doing so.  Ex. C at 151:23-25; 152:1-10.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     98.     Her supervisors began monitoring her every move and bathroom break.  Ex. A at 51:22-25 and 50:1-16 and  Ex. C at 86:17-20 and 87:4-8.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

99.      They began monitoring all the time when she logged in, went to lunch, took a break and logged out.  Ex. C at 88:6-9.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

100.      They would comment about the time she spent, to which Mrs. Gardner would respond that it was due to her pregnancy related sickness and that she could not help it.  *Id.* at 152:11-13.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

101.      However, they continued to send constant emails demanding updates as to where she was going, where she was, how long she was gone, and why was she gone so long.  *Id.* at 86:25; 87:1-6; 153:6-16 and 154:1-4.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

102.      Through this behavior Mrs. Gardner's supervisors attempted to keep her at her desk without any breaks by reaming her out when she took breaks.  *Id.* at 86:17-20 and 155:2-6.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

103.　　Mrs. Gardner felt that she was being discriminated against and was receiving disparate treatment because she was a minority and she was pregnant. Ex. A at 25:11-16 and 42:6-8 and Ex. C at 86:12-15.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

104.　　Mrs. Gardner went to speak with the vice president, Jana Sybrowsky, and informed her of the behavior of her supervisors.  *Id.* at 94:12-25; 95:1.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

105.　　Jana told Mrs. Gardner that she would look into the issue.  *Id.* at 96:5-7.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

106.　　Subsequently, Jana met with Mrs. Gardner and indicated that they were looking into moving Mrs. Gardner to another team so that she would not have to work under her current supervisors.  *Id.* at 96:11-17.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

107.     However, Jana later informed Mrs. Gardner that she was too valuable to her team and that they would not be moving her.  *Id.* at 101:10-16.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

108.     After the meeting with Jana, the situation worsened; one of Mrs. Gardner's supervisors in particular refused to even look at Mrs. Gardner.  *Id.* at 105:2-5.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

109.     She felt like she was on her supervisors "target list."  *Id.* at 105:2-5; 111:11-17.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

110.     Realizing that she would be required to continue to work under her supervisors, on June 20, 2013, Mrs. Gardner sent a conciliatory email to one of her supervisors.  Ex. D.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     **111.**     Mrs. Gardner sent the email because she was fearful that she would be retaliated against for complaining about discrimination.  Ex. C at 186:24-25 and 187:1-4.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     **112.**     She felt that her job was on the line.  *Id.* at 108:9-11.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     **113.**     Approximately, six weeks after complaining of discrimination and less than a month after applying for FMLA leave, Mrs. Gardner's employment was terminated on August 1, 2013.  Ex. A at 101:8-18 and Ex. G.

**Deseret Mutual Response:**  Deseret Mutual acknowledges that Ms. Gardner's employment was terminated, but the remaining facts are irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

     **114.**     The reason offered for her termination was that for the period from May 1, 2013, through July 31, 2013, during her pregnancy and related sickness, Mrs. Gardner had, allegedly, intentionally disconnected 52 calls.  Ex A at 67:8-9 and Ex. G.

**Deseret Mutual Response:**  Deseret Mutual admits that it had cause to terminate Ms. Gardner, but this fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

115.    Deseret Mutual did not provide Mrs. Gardner with any documentation to support the allegations that she had intentionally dropped the calls.  Ex. C at 188:15-25 and 189:1.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

116.    Prior to her pregnancy, Mrs. Gardner never hung up any calls.  *Id.* at 115:22-24.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

117.    After her pregnancy, Mrs. Gardner may have disconnected one or two calls because she had to throw up into her waste basket or run to the bathroom because of her pregnancy related sickness.  *Id*. at 114:13-25; 116:9-10.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

118.    Mrs. Gardner was not informed or warned prior to her termination

that there was an issue with her number of dropped calls.  Ex. A at 79:15-22.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

119.     She was not given an opportunity or allowed to correct the alleged problem as Deseret Mutual had allowed her to do in prior instances of performance issues, such as tardies.  Ex. C at 180:20-25 and 181:1-3

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

120.     Had she been given an opportunity to correct the issue she would have.  *Id.* at 180:23-25 and 181:1.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

121.     During this period, Mrs. Gardner was meeting the specified amount of calls.  Ex. A at 55:3-7.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

122.     During the same time period that Mrs. Gardner's allegedly disconnected 52 calls, a Caucasian, male employee, Chad Loveland, disconnected 333 telephone calls.  *Id.* at 69:24-25; 70:1-17; and 71:18-20.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

123.    In a single day, June 24, 2013, Chad disconnected at least 78 telephone calls.  Ex. C at 164:1-21 and Ex. A at 69:2-4; 124:20-25; and 125:1-21.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

124.    Chad was given an opportunity to correct his issues.  *Id.* at 73:20-25 and 74:1-3.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

125.    Mrs. Gardner was terminated on Thursday, August 1, 2013, the day before the Gardners were leaving on their annual family camp.  *Id.* at 101:8-18 and Ex. G.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

126.    Despite his numerous dropped calls, Chad was promoted, while Mrs. Gardner was terminated.  Ex. A at 67:11-21.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

127.    Thus, Mr. Gardner reasonably concluded that Deseret Mutual had discriminated against Mrs. Gardner when it refused to give her the promotion that was given to Chad, and terminated her instead.  *Id.* at 69:12-23.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

128.    Mr. Gardner was notified the day of his wife's termination and was allowed to escort her home.  *Id.* at 165:15-23.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

129.    Mr. Gardner had been informed that Deseret Mutual had an unwritten policy not to hire pregnant women.  *Id.* at 59:14-20.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

130.    Mr. Gardner was specifically told "Do not hire a pregnant person again." by his direct supervisor, Donna McReavy.  *Id.* at 59:14-20 and 60:20-23.

49

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **131.**      This occurred after Mr. Gardner and another manager hired a pregnant woman.  *Id.* at 59:14-20 and 60:17-23.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **132.**      Deseret Mutual terminated this pregnant employee's employment shortly after she was hired, and Bryce was called into meet with Donna McReavy and told not to hire a pregnant employee again immediately after this employees termination.  *Id.* at 59:14-20.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

> **133.**      Mr. Gardner is aware of other employees who have been terminated due to their pregnancy.  *Id.* at 62:2-16.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.  This is also a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**134.**     Specifically, Julia Barnes, a former Deseret Mutual employee, told Mr. Gardner that after she announced she was pregnant she was treated extremely different by Donna and Allison. *Id.* at 197:13-21.

**Deseret Mutual Response:**  This is inadmissible hearsay and this fact should be stricken.

**135.**     In another instance, a pregnant employee was terminated and then denied FMLA coverage. *Id.* at 62:12-16; 66:11-18; 109:20-25 and 110:1-8.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**136.**     Mr. Gardner saw the hostility and discrimination directed at his wife. *Id.* at 50:8-16.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**137.**     He saw that there was an appearance that Mrs. Gardner was being expected to be on the phones more than others and was not allowed to take medically necessary breaks. *Id.* at 55:19-24; 56:13-15; 57:3-17.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**138.**     He also saw that she was not given any verbal or written warnings about dropped calls or attendance issues prior to her termination. *Id.* at 79:20-22; 80:12-15; 180:20-25; 181:1-3; 188:15-25 and 189:1

**Deseret Mutual Response:**  This fact should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  Ms. Gardner had attendance issues during her employment and was placed on probation.  *See Deposition of Yohana Gardner* at 47:15-51:9 (discussing numerous warnings regarding attendance and placing Ms. Gardner on probation).

139.    He saw that she was not given an opportunity to correct these alleged issues which had been afforded other employees.  *Id.* at 79:20-22; 80:12-15; 180:20-25; 181:1-3; 188:15-25 and 189:1

**Deseret Mutual Response:**  This fact should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  Ms. Gardner had attendance issues during her employment and was placed on probation.  *See Deposition of Yohana Gardner* at 47:15-51:9 (discussing numerous warnings regarding attendance and placing Ms. Gardner on probation).

140.    As a manager, Mr. Gardner was familiar with Deseret Mutual's disciplinary standards.  *Id.* at 30:23-25 and 31:1-3.

**Deseret Mutual Response:**  Deseret Mutual agrees that Mr. Gardner should have been familiar with disciplinary standards.

141.    After Mr. Gardner became aware of the reason for Mrs. Gardner's termination he recognized discrepancies in Deseret Mutual's treatment of Mrs. Gardner's termination.  *Id.* at 30:23-25 and 31:1-3.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

> **142.** On August 5, 2013, Mr. Gardner met with Scott Eastmond and expressed his opposition to Mrs. Gardner's termination to Deseret Mutual. *Id.* at 86:14-20.

**Deseret Mutual Response:** Mr. Gardner and Scott Eastmond did meet on August 5, 2013 to discuss Mr. Gardner's opinions about Ms. Gardner's termination.

***Element Two of a Claim of Retaliation under FMLA or Title VII:***

[*Text Omitted*]

> **143.** After opposing Mrs. Gardner's termination, Mr. Gardner was retaliated and discriminated against by Deseret Mutual and was subjected to hostility from his co-workers and superiors, specifically, Donna McReavy, Allison Bishop, Jana Sybrowksy and Scott Eastmond, for his opposition to his wife's termination. Ex. A at 31:5-8.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

> **144.** As soon as it became known that Mr. Gardner was opposing his wife's termination "it was like the faucet was turned off. [Mr. Gardner] no longer had communications, [he] felt on an island. Despite multiple projects [he] was running [he] felt [he] couldn't even leave [his] office to use the restroom without being questioned why." *Id.* at 84:8-18.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

145.     Among other things, Ms. Bishop refused to look at Mr. Gardner when she spoke to him and Jana no longer spoke cordially to him.  *Id.* at 93:12-19.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

146.     Donna, who had previously been very friendly made a complete change of attitude toward him.  *Id.* at 102:2-13.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

147.     His co-workers began finding ways of circumventing him and removing him from the picture.  *Id.* at 96:21-24; 97:21-23; 138:16-25; and 139:1-4.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

148.     Mr. Gardner was denied assignments and supervisory roles that had been his in the past, such as the VSP project.  *Id.* at 85:12-23.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

149.     On the morning of August 5, 2013, Mr. Gardner had a meeting with Scott Eastmond and expressed his opposition to Mrs. Gardner's termination. *Id.* at 86:14-20.

**Deseret Mutual Response:** Mr. Gardner and Scott Eastmond did meet on August 5, 2013 to discuss Mr. Gardner's opinions about Ms. Gardner's termination.

150.     After that meeting, Mr. Gardner began feeling hostility from his co-workers, specifically, Jana, Allison and Donna. *Id.* at 86:20-21.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

151.     On August 23, 2013, the Gardners had a meeting with Scott and Bob regarding Mrs. Gardner's termination and the growing hostility directed toward Mr. Gardner for opposing Mrs. Gardner's termination. *Id.* at 86:24-25 and 87:1-18.

**Deseret Mutual Response:** Deseret Mutual admits that the meeting took place but the remaining facts are a conclusion and not supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

152.     On August 29, 2013, Mr. Gardner met with Scott and Bob strictly about the hostility that was directed at Mr. Gardner because of his opposition to his wife's termination. *Id.* at 206:17-20.

**Deseret Mutual Response:**  Deseret Mutual admits that the meeting took place but the remaining facts are a conclusion and not supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

      153.      At the August 29th meeting Scott and Bob stated to Mr. Gardner that "Scott was going to be meeting with Layne, Andy, and Kent about [Mr. Gardner] possibly moving to one of their areas because [Mr. Gardner] had mentioned to them in that meeting that [he] felt there was some hostility towards [him]."  *Id.* at 202:21-25 and 203:1-2.

**Deseret Mutual Response:**  This is a citation to Mr. Gardner's deposition testimony and is not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

      154.      Bob also gave Mr. Gardner five days of paid leave to decide where he wanted to go.  *Id.* at 88:22-25.

**Deseret Mutual Response:**  Mr. Gardner was placed on administrative leave but this is a conclusion not supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

      155.      On September 5, Mr. Gardner again met with Scott who informed him that Layne, Andy and Kent would all like to have him and asked Mr. Gardner to take some time to think about where he would like to go.  *Id.* at 90:3-8 and 209:12-16.

**Deseret Mutual Response:**  Deseret Mutual admits there was a meeting but this statement is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

156.     The next day, Mr. Gardner emailed Scott and informed him that he would like to be transferred to client services [employer relations] with Layne Sybrowsky.  *Id.* at 90:23-25; 91:1-3; and 209:16-19.

**Deseret Mutual Response:**  Deseret Mutual admits that Mr. Gardner informed Scott Eastmond that he would like to be transferred.

157.     Scott responded "Great. I'll go ahead and get with Brad and Layne and let them know."  *Id.* at 91:5-7 and 209:23-24.

**Deseret Mutual Response:**  This is a citation to Mr. Gardner's deposition testimony and is not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

158.     In **none** these meetings, (i.e. August 5, 23, 29 and September 5) was Mr. Gardner's facebook post raised with him by either Scott or Bob. [sic] Ex. B at ¶12-14.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

159.     On September 9, Mr. Gardner sent Scott a follow up email to coordinate his transfer, Scott responded that "after further consideration this morning . . . we want to emphasize a desire to resolve both sides of this equation

(i.e., both your situation and Johana's [*sic*])at the same time. . . . Bob and I believe it is in everyone's best interest to achieve resolution of these issues before you return." Ex. J. As Mr. Gardner put it, "we've decided that until Yohana's issue is resolved you will not be returning." Ex. A at 91:21-25; 92:1 and 210:10-12.

**Deseret Mutual Response:** The email speaks for itself and the remaining fact asserted is a citation to Mr. Gardner's deposition testimony that contains a conclusion and is not supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**160.** Mr. Gardner remained on paid administrative leave until October 30, 2013, when Mr. Gardner was informed that his employment would be terminated on October 31, 2013. *Id.* at 211:23-25 and 212:1-6.

**Deseret Mutual Response:** Deseret Mutual admits that Mr. Gardner remained on paid administrative leave until October 31, 2013.

***Element Three of a Claim of Retaliation under FMLA or Title VII:***

[*Text Omitted*]

**Concise Statement of Additional Material Facts Regarding Element Three of a claim of Retaliation under FMLA or Title VII:**

See Statement of Additional Material Fact 53 through 160.

**161.** Within one month after his meeting with Scott opposing his wife's termination Mr. Gardner was placed on administrative leave and was not allowed to return until Deseret Mutual had resolved the issue regarding his wife's termination. Ex. A at 86:14-20; 88:22-25; 91:21-25; 92:1 and 210:10-12.

**Deseret Mutual Response:** Deseret Mutual acknowledges that Mr. Gardner was placed on administrative leave but the remaining facts are conclusions and are not supported by

admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

> **162.** His potential return was made contingent on a resolution of his wife's wrongful termination claims. *Id.* at 91:21-25; 92:1 and 210:10-12 and Ex. J.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

> **163.** In a letter dated October 7, 2013, Deseret Mutual stated that their "concerns" Mr. Gardner's future employment "may be exacerbated as a consequence of the actions his wife may or may not take against DMBA for termination of her employment." See Ex. K.

**Deseret Mutual Response:** The referenced letter speaks for itself.

> ***Burden Shifting Element of a claim of Retaliation under FMLA or Title VII:***
>
> [*Text Omitted*]
>
> **Concise Statement of Additional Material Facts Regarding Pretext Element**
>
> **164.** Gardners hereby incorporate facts 53 through 164 above.
>
> **165.** The facebook post is not a threat. It is a statement of opposition to mistreatment of his wife (by a repairman) and a statement that he will be seeking justice. Ex. H.

**Deseret Mutual Response:** The Facebook post speaks for itself. This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.*, 2010 U.S. Dist.

LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**166.** The post consists of a series of vague, generalized statements of Mr. Gardner's feelings related to an apparent injustice served on his wife. *Id.*

**Deseret Mutual Response:** The Facebook post speaks for itself. This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**167.** There is no individual or group of individuals identified as to whom the post is directed. *Id.*

**Deseret Mutual Response:** The Facebook post speaks for itself. This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**168.** There is no proposed action identified or indicated within the post, other than a desire to seek justice through legal process. *Id.*

**Deseret Mutual Response:** The Facebook post speaks for itself. This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

**169.** The statements in the post that "justice will be served" and "It's time to bring the rain" refer to Mr. Gardner's intent to contact legal counsel about possibly bringing a claim against the heating and air conditioning company. Ex. A

at 176:22-25 and 177:1-12, 19-25.

**Deseret Mutual Response:**  The Facebook post speaks for itself.  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

170.     In a letter dated August 6, 2013, Mr. Gardner's supervisor, Donna McReavy stated that the posting did not contain an explicit threat; however, it did appear to have a veiled threat to people involved with [his wife's] termination.  Due to the uncertainty and vagueness of the posting, it's difficult to determine his intentions.  The posting could have been done for a range of reasons from venting frustration to wanting to harm people's reputations to the potential for destruction of property or physical harm.

See Ex I.

**Deseret Mutual Response:**  The letter speaks for itself.

171.     Deseret Mutual acknowledges that the post is not an explicit threat.  *Id.*

**Deseret Mutual Response:**  The Facebook post speaks for itself.

172.     It acknowledges that the post is uncertain and vague and they did not know what Mr. Gardner's intentions are.  *Id.*

**Deseret Mutual Response:**  The Facebook post speaks for itself.

173.     Mr. Gardner clarified the issue with Jana Sybrowsky and the issue was never raised again until a letter from counsel on October 7, more than two months later.  Ex. B.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible

evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13,

2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

     **174.**     Mrs. Gardner was terminated on Thursday, August 1, 2013, the day
before the Gardners were leaving on their annual family camp.  Ex. A at 101:8-18
and Ex. G.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial

summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of

good faith and fair dealing, and retaliation under Title VII and FMLA.

     **175.**     That same day Mr. Gardner was notified of Mrs. Gardner's
termination and was allowed to escort her home.  Ex. A at 165:15-23.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial

summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of

good faith and fair dealing, and retaliation under Title VII and FMLA.

     **176.**     Mrs. Gardner had the entire weekend to process her termination.  Ex.
B at ¶10.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial

summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of

good faith and fair dealing, and retaliation under Title VII and FMLA.

     **177.**     The facebook post was not made until the afternoon of August 5,
2013, after Mrs. Gardner called Mr. Gardner in tears regarding the visit of the
heating and air repairman.  Ex. A at 181:15-16; 173:20-21; and Ex H.

**Deseret Mutual Response:**  The Facebook post speaks for itself.

**178.** The facebook post was in response to something that happened on the afternoon of August 5 that upset Mrs. Gardner and she would call her husband in tears, not something that happened five days previous on August 1. Ex. B at ¶11.

**Deseret Mutual Response:** The Facebook post speaks for itself.

**179.** At lunch on August 5, 2013, Mr. Gardner's wife called him in tears. Ex. A at 181:15-16 and 173:20-21.

**Deseret Mutual Response:** This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

**180.** Mrs Gardner explained that her father had contacted a heating and cooling company to repair their air conditioning unit that had malfunctioned. Ex. A at 172:10-23.

**Deseret Mutual Response:** This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

**181.** Before the repairman was scheduled to inspect the air conditioning unit, Mrs. Gardner's friend repaired the unit. *Id.* at 172:24-25 and 173:1-6.

**Deseret Mutual Response:** This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

**182.** Mrs. Gardner's father contacted the repairmen and informed him that the unit had been repaired. *Id.* at 173:6-12

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

      **183.**      Nonetheless, a repairmen showed up and Mrs. Gardner informed him that the matter had been resolved.  *Id.* at 173:12-19.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

      **184.**      The repairmen then made derogatory, racist, sexist and offensive comments to Mrs. Gardner and her parents.  *Id.* at 173:13-19.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA. This fact should also be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  *See Deposition of Yohana Gardner* at 149:19-22 (testifying that the alleged repairmen did not say anything to Ms. Gardner).

      **185.**      Mr. Gardner's facebook post was in response to the repairman's treatment of his wife and family.  *Id.* at 172:11-12 and 173:20-21.

**Deseret Mutual Response:**  This fact is irrelevant to the pending motion seeking partial summary judgment on Bryce Gardner's claims for breach of contract, breach of the covenant of good faith and fair dealing, and retaliation under Title VII and FMLA.

**186.**      Soon after making the post to facebook, Mr. Gardner was contacted by Jana Sybrowsky about the post.  *Id.* at 173:22-23.

**Deseret Mutual Response:**  Deseret Mutual admits that Ms. Sybrowsky met with Mr. Gardner to discuss the Facebook post.  Mr. Gardner's testimony on this subject indicates that he believed he was going to be terminated for making the Facebook post and acknowledges that the post could be "construe[d] . . . as me going after Deseret Mutual."  *Deposition of Bryce Gardner* at 174:1-22.

**187.**      Mr. Gardner immediately removed the post from facebook.  *Id.* at 173:24-25.

**Deseret Mutual Response:**  Deseret Mutual admits that, to its knowledge, Mr. Gardner removed the Facebook post.

**188.**      The next day, August 6, Mr. Gardner again met with Jana who told him that he had handled things right.  *Id.* at 174:13-22.

**Deseret Mutual Response:**  Deseret Mutual admits that, because of the great concern it had over the Facebook post, it met with Mr. Gardner about the post on multiple occasions.  The remaining portion of this fact is inadmissible hearsay and should be stricken.

**189.**      After that meeting with Jana, no further action was taken with respect to the facebook post, nor was it discussed again, until this litigation.  Ex. B at ¶12.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").  This statement

is also contrary to evidence cited by Mr. Gardner.  Specifically, on September 10, 2013, in Mr.

Gardner's email communications with Scott Eastmond, Mr. Eastmond states:

> As you described the "hostility" you were experiencing to me and Bob on the day
> we invited you to take some leave, I tried to gently remind you that you were
> dealing with people who felt you had threatened them on Facebook and who
> believed you were going to attempt to twist every word they said or action they
> took.

*Exhibit B to Reply Memorandum* at GNR00180.  Mr. Gardner's belated assertion that he

was unaware that the Facebook post was a concern for Deseret Mutual is simply not true—it was

discussed during the meeting with Bob Johnson and Scott Eastmond, and again addressed in

written communications on September 10, 2013.

     **190.**     It was not reasonable for Deseret Mutual employees to feel
threatened by the post. Ex. A at 180:12-24.

     **Deseret Mutual Response:**  This fact should be disregarded under the Sham Affidavit

Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will

"disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham

fact issue").  This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-*

*Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported

conclusory allegations . . . do not create an issue of fact.").  Mr. Gardner testified that "someone

could construe [the Facebook post] as me going after Deseret Mutual" and that his coworkers

"could have possibly viewed it as a threat." *Deposition of Bryce Gardner* at 174:8-11 and 178:18-

12.

     **191.**     On August 1, 2013, Mr. Gardner has specifically blocked Ms.
McReavy and Ms. Bishop from his facebook account such that they did not have
access to any of his posts. *Id.* at 230:3-13.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, \*15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").  Mr. Gardner's own facts show that he knew employees of Deseret Mutual had access to the post. *See Statement of Additional Elements and Additional Facts* at 186-187.

192.     On September 9, Mr. Gardner sent Scott a follow up email to coordinate his transfer, Scott responded that "we've decided that until Yohana's issue is resolved you will not be returning." *Id.* at 91:21-25; 92:1 and 210:10-12 and Ex. J.

**Deseret Mutual Response:**  The referenced email speaks for itself and citation to Mr. Gardner's deposition testimony purporting to summarize an email is not admissible evidence.

193.     Neither the facebook post nor the fears of his co-workers were given as the reason for his leave or their determination not to allow him to return.  Ex. A at 88:12-25.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, \*15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact."). As cited above, this statement is also contrary to evidence cited by Mr. Gardner. *Exhibit B to Reply Memorandum* at GNR00180 (email from Scott Eastmond addressing Facebook threat and referencing discussion of Facebook threat during previous meeting with Bob Johnson).  Mr. Gardner's belated assertion that he was unaware that the Facebook post was a concern for Deseret Mutual is simply not true.

194.     Mr. Gardner believed that Deseret Mutual was "angry that [he] pointed out its inconsistent disciplinary standards and instead of addressing those

inconsistent disciplinary standards it attempted to paint [him] as this person who's horrible –to horriblize [sic] [him], to assassinate [his] character, if you will, and put smoke and mirrors up to the reason why [they] found [themselves] in this situation, which was the termination of a pregnant minority." *Id.* at 223:14-23.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

195.    On October 1, 2013, the parties met with their respective counsel to discuss a possible settlement. *Id.* at 210:20-25.

**Deseret Mutual Response:**  Deseret Mutual acknowledges that the parties met with counsel.

196.    The first time, Deseret Mutual raised an issue about the facebook post was in a letter sent by Deseret Mutual's legal counsel to the Gardner's legal counsel on October 7, 2013.  Ex K.

**Deseret Mutual Response:**  This fact should be disregarded under the Sham Affidavit Rule.  *See Franks v. Nimmo,* 796 F.2d 1230, 1237 (10th Cir. 1986) (stating that courts will "disregard a contrary affidavit when they conclude that it constitutes an attempt to create a sham fact issue").  Mr. Gardner's own facts and testimony show that he met with Jana Sybrowsky on at least two occasions to discuss the Facebook post. *Deposition of Bryce Gardner* at 174:1-176:3. Additionally, as cited above, the notion that the Facebook post was not addressed until October 7, 2013 is false and contradicted by Mr. Gardner's own exhibit. *Exhibit B to Reply Memorandum* at GNR00180.

197.    In that letter Deseret Mutual stated that their "concerns" about the facebook post "may be exacerbated as a consequence of the actions his wife may

or may not take against DMBA for termination of her employment."  *Id.*

**Deseret Mutual Response:**  This letter speaks for itself.

198.     Mr. Gardner viewed this statement as an admission that he was being terminated due to his and his wife's opposition to her termination by Deseret Mutual. Ex. B at ¶15.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible

evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13,

2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

199.     Deseret Mutual indicated that it was going "to consider Mr. Gardner's continued employment based on its budgetary needs and its comfort level with Mr. Gardner's behavior on a go-forward basis."  Ex. K.

**Deseret Mutual Response:**  This letter speaks for itself.

200.     Since making this statement, Deseret Mutual has failed to set forth any evidence or facts, and has failed to allege in this litigation, that Mr. Gardner was terminated for "budgetary needs."  This failure is evidence that Deseret Mutual's statement that Mr. Gardner was being terminated for budgetary needs was false and was in fact a pretext for Mr. Gardner's termination.

**Deseret Mutual Response:**  This is a conclusion and not a fact supported by admissible

evidence.  *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13,

2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

201.     Mr. Gardner viewed these statements as pretext for terminating him for opposing his wife's termination.  Ex. A at 221:122-25 and 221:1-7.

**Deseret Mutual Response:** This is a conclusion and not a fact supported by admissible evidence. *Forbes v. Wal-Mart Stores, Inc.,* 2010 U.S. Dist. LEXIS 23967, *15 (D.Utah Mar. 13, 2010) ("Unsupported conclusory allegations . . . do not create an issue of fact.").

    **202.**    Mr. Gardner remained on paid administrative leave until October 30, 2013, when Mr. Gardner was informed that his employment would be terminated on October 31, 2013. *Id.* at 211:23-25 and 212:1-6.

**Deseret Mutual Response:** Deseret Mutual acknowledges that Mr. Gardner was on paid administrative leave until October 30, 2013.