IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| YOHANA GARDNER, an individual, and BRYCE GARDNER, an individual, <br><br>                  Plaintiffs, <br> v. <br><br> DESERET MUTUAL BENEFIT ADMINISTRATORS, a Utah non-profit corporation, <br>                  Defendant. | **MEMORANDUM DECISION AND ORDER GRANTING IN PART AND DENYING IN PART [17] MOTION FOR PARTIAL SUMMARY JUDGMENT** <br><br> Case No. 2:14-CV-00602 <br><br> District Judge David Nuffer |

Defendant Deseret Mutual Benefit Administrators ("Deseret Mutual") filed a motion for partial summary judgment seeking the dismissal of Plaintiffs Yohana Gardner and Bryce Gardner's ("the Gardners") three causes of action relating to Bryce Gardner ("Mr. Gardner"): FMLA retaliation and Title VII retaliation (Fourth Cause of Action), breach of contract (Sixth Cause of Action), and breach of covenant of good faith and fair dealing (Seventh Cause of Action).[1] After review of the pleadings and memoranda submitted by the parties, and the relevant legal authorities, Deseret Mutual's motion is granted in part and denied in part.

---

[1] *See* Amended Motion and Memorandum in Support of Partial Summary Judgment on Bryce Gardner's Claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Retaliation ("Amended Motion"), docket no. 17, filed Jan. 28, 2015.

# Table of Contents

Undisputed Material Facts ............................................................................................................ 2

    A.    Background Facts.............................................................................................. 3

    B.    Facts Relating to Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing................................................................................................................ 4

    C.    Fact Relating to FMLA Retaliation and Title VII Retaliation ....................................... 7

Standard of Review........................................................................................................................ 22

Discussion ..................................................................................................................................... 23

    A.    No Triable Issue of Fact Exists as to the Gardners' Breach of Contract Claim and the Claim Fails as a Matter of Law.................................................................................... 23

    B.    Because No Employment Contract for a Duration Other Than an Indefinite Term Existed Between Mr. Gardner and Deseret Mutual, the Gardners' Breach of Covenant of Good Faith and Fair Dealing Claim Fails as a Matter of Law ............................... 30

    C.    The Existence of Genuine Disputes of Material Fact Precludes Summary Judgment on the Gardners' FMLA Retaliation and Title VII Retaliation Claim....................... 32

        I.    Prima Facie Case Established ............................................................ 34

        II.    Burden Shift—Legitimate Reason ......................................................... 36

        III.    Burden Shift—Pretext.......................................................................... 37

Order ........................................................................................................................................... 40

## UNDISPUTED MATERIAL FACTS

The following undisputed material facts are a reconciliation of the statement of material facts within Deseret Mutual's Amended Motion,[2] the Gardners' responses and statement of additional material facts within their Opposition Memorandum,[3] and Deseret Mutual's reply to the Gardners' responses and statement of additional material facts attached to its Reply Memorandum.[4] The headings in this statement of undisputed material facts are descriptive, not declaratory or substantive.

---

[2] *See id.* at 6-15, ¶¶ 1-52.

[3] *See* Memorandum in Opposition to Defendant's Amended Motion and Memorandum in Support of Partial Summary Judgment on Bryce Gardner's Claims for Breach of Contract, Breach of the Covenant of Good Faith and Fair Dealing, and Retaliation ("Opposition Memorandum") at 7-60, ¶¶ 53-202, docket no. 20, filed Mar. 23, 2015.

[4] *See* Reply Memorandum in Support of Amended Motion for Partial Summary Judgment ("Reply Memorandum") at Exhibit A, docket no. 25-1, filed Apr. 30, 2015.

## A.  Background Facts

1.      Deseret Mutual is a non-profit corporation employing approximately 400 associates in their Salt Lake City office.[5]

2.      Deseret Mutual's primary function is to administer a competitive benefits program for employees of the Church of Jesus Christ of Latter-day Saints and its affiliated organizations.[6]

3.      Deseret Mutual's call center associates are divided into specialty teams, such as customer service and enrollment, and file telephone calls and written requests regarding medical and dental insurance, life insurance, disability insurance, and retirement plans.[7]

4.      A friendly work environment is encouraged by Deseret Mutual, and associates are not prohibited from using social media websites for communicating with each other, in and out of work, including use of the website www.facebook.com.[8]

5.      Mr. Gardner was hired by Deseret Mutual on February 21, 2006.[9]

6.      Mr. Gardner was promoted to manager of the enrollment and retirement teams in early 2013.[10]

7.      At work, Mr. Gardner discussed owning guns with associates and co-workers, including associates he supervised on the enrollment and retirement teams.[11]

[5] See Amended Motion at 5, ¶ 1 (citing Associate Handbook § 1, DMBA00265, docket no. 17-4, filed Jan. 28, 2015).

[6] See id. at 5, ¶ 2 (citing Declaration of Scott E. Eastmond in Support of Motion for Partial Summary Judgment ("Eastmond Declaration") ¶ 5, docket no. 17-1, filed Jan. 28, 2015).

[7] See id. at 5, ¶ 3 (citing Eastmond Declaration ¶¶ 6-7).

[8] See id. at 6, ¶ 4 (citing Eastmond Declaration ¶ 8; Deposition Transcript of Bryce Gardner, dated Dec. 12, 2014 ("Bryce Gardner Depo."), at 171:19-172:1, docket no. 20-1, filed Mar. 23, 2015).

[9] See id. at 6, ¶ 5 (citing Deseret Mutual Benefit Administrators Conditions of Employment Statement, dated Feb. 21, 2006, DMBA00372 ("Employment Statement"), docket no. 17-6, filed Jan. 28, 2015).

[10] See id. at 6, ¶ 6 (citing Bryce Gardner Depo. at 13:12-13).

3

8.      Mr. Gardner regularly carried a knife to work.[12]

9.      At one point, Mr. Gardner coordinated and arranged a concealed weapons permit class for Deseret Mutual associates.[13]

10.     In April 2013, Mr. Gardner married an associate working on Deseret Mutual's customer service team, now known as Yohana Gardner ("Mrs. Gardner").[14]

### B.  Facts Relating to Breach of Contract and Breach of Covenant of Good Faith and Fair Dealing

11.     As part of Mr. Gardner's initial employment paperwork, he read, understood, and signed a Conditions of Employment Statement on February 21, 2006 ("Employment Statement").[15]

12.     The Employment Statement states:

> I agree and understand that the contents of this handbook and all Deseret Mutual manuals dealing with employment policies are presented as a matter of information only and are not to be understood or construed as a promise or contract between Deseret Mutual and its employees. I understand and agree that I have received no promise from Deseret Mutual regarding potential length of employment or promotion of any kind. I further understand that I have the right to terminate my employment at any time and that Deseret Mutual retains a similar right.[16]

13.     Deseret Mutual's Human Resources Policy Manual ("HR Manual"), which is a portion of Deseret Mutual's employee handbook, states:

> It is the policy of Deseret Mutual that its human resources Policies are to be used as an outline of the basic Human Resources practices and procedures for Deseret

---

[11] *See id.* at 6, ¶ 7 (citing Bryce Gardner Depo. at 184:5-24); Opposition Memorandum at 7-8, Gardners' Response to Statement of Fact 7 (citing Bryce Gardner Depo. at 8:19-20, 184:5-24, 186:21-22; Declaration of Bryce Gardner ("Gardner Declaration") ¶¶ 3-4, docket no. 20-2, filed Mar. 23, 2015).

[12] *See* Amended Motion at 6, ¶ 8 (citing Bryce Gardner Depo. at 185:4-8, 23-25).

[13] *See id.* at 6, ¶ 9, (citing Bryce Gardner Depo. at 184:12-24; 186:5-187:8).

[14] *See id.* at 6, ¶ 10 (citing Bryce Gardner Depo. at 6:3-8; Eastmond Declaration ¶ 9).

[15] *See id.* at 7, ¶ 11 (citing Employment Statement; Bryce Gardner Depo. 145:24-147:16).

[16] *See id.* at 7, ¶ 12 (citing Employment Statement).

Mutual. They are not intended to alter the employment-at-will relationship in any way. (See Employment-At-Will, Policy 106.)[17]

14.     Policy 106 of the HR Manual outlines that:

It is the policy of Deseret Mutual that all associates who do not have a written employment contract with Deseret Mutual for a specific, fixed term of employment are employed at the will of Deseret Mutual for an indefinite period.[18]

15.     Comment 1 to Policy 106 of the HR Manual states:

Associates who do not have a separate, individual written employment contract are employed at the will of Deseret Mutual and are subject to termination at any time, for any reason, with or without cause or notice.[19]

16.     Comment 2 to Policy 106 of the HR Manual states:

No Deseret Mutual representative is authorized to modify this policy for any associate or to enter into any agreement, oral or written, that changes the at-will relationship.[20]

17.     Comment 3 to Policy 106 of the HR Manual further clarifies that:

This policy may not be modified by any statements contained elsewhere in Deseret Mutual Human Resources policies, or any other associate handbooks, employment applications, Deseret Mutual recruiting materials, Deseret Mutual memoranda, or other materials provided to applicants and associates in connection with their employment. None of these documents, whether singly or combined, create an express or implied contract of employment for a definite period, … or an express or implied contract concerning any terms or conditions of employment. Similarly, Deseret Mutual policies and practices with respect to any matter are not to be considered as creating any contractual obligation on Deseret Mutual's part or as stating in any way that termination will occur only for "just cause." Statements of specific grounds for termination set forth in Human Resources policies or in any other Deseret Mutual documents are examples only,

---

[17] *See id*. at 7, ¶ 13 (citing HR Manual at 102 – Functions of Human Resources Policies – 04/06, GNR00188, docket no. 17-7, filed Jan. 28, 2015 (emphasis in original)).

[18] *See id*. at 7-8, ¶ 14 (citing HR Manual at 106 – Employment-At-Will – 04/06, GNR00193, docket no. 17-7, filed Jan. 28, 2015).

[19] *See id*. at 8, ¶ 15 (citing HR Manual at 106 – Employment-At-Will – 04/06, GNR00193, docket no. 17-7, filed Jan. 28, 2015).

[20] *See id*. at 8, ¶ 16 (citing HR Manual at 106 – Employment-At-Will – 04/06, GNR00194, docket no. 17-7, filed Jan. 28, 2015).

not all-inclusive lists, and are not intended to restrict Deseret Mutual's right to terminate at-will.[21]

18.     Policy 211 of the HR Manual also provides that:

It is the policy of Deseret Mutual to terminate employment because of an associate's resignation, discharge, retirement, expiration of an employment contract, or permanent reduction in the work force. Discharge can be for any reason not prohibited by law. In the absence of a specific written agreement, associates are free to resign at any time and for any reason and Deseret Mutual reserves the right to terminate employment at any time and for any reason.[22]

19.     During his deposition, Mr. Gardner testified that he understood the terms of Policy 106.[23]

20.     During his deposition, Mr. Gardner testified that he understood his employment was at-will.[24]

21.     As a manager and supervisor of employees, Mr. Gardner had hiring and firing power and was aware of and familiar with Deseret Mutual's employment practices and its hiring and discipline practices.[25]

22.     During his deposition, Mr. Gardner testified that Deseret Mutual always followed its disciplinary process set out in its associate handbook, administrative policies, and HR Manual by first giving a verbal warning, then a written warning, then discipline, and finally termination.[26]

---

[21] *See id.* at 8, ¶ 17 (citing HR Manual at 106 – Employment-At-Will – 04/06, GNR00194, docket no. 17-7, filed Jan. 28, 2015).

[22] *See id.* at 8-9, ¶ 18 (citing HR Manual at 211 – Termination of Employment – 04/06, GNR00220, docket no. 17-7, filed Jan. 28, 2015).

[23] *See id.* at 9, ¶ 19 (citing Bryce Gardner Depo. at 156:9-17); Opposition Memorandum at 11, Gardners' Response to Statement of Fact 19 (citing Bryce Gardner Depo. at 156:9-17).

[24] *See* Amended Motion at 9, ¶ 20 (citing Bryce Gardner Depo. at 156:6-8); Opposition Memorandum at 11, Gardners' Response to Statement of Fact 20 (citing Bryce Gardner Depo. at 13:20-23, 83:9-17, 156:1-25).

[25] *See* Opposition Memorandum at 42, ¶ 53 (citing Bryce Gardner Depo. at 11:10-13:23, 83:11-17, 158:15-19), 51, ¶ 140 (citing Bryce Gardner Depo. at 30:23-31:3).

[26] *See id.* at 42, ¶ 54 (citing Bryce Gardner Depo. at 83:9-17), ¶ 55 (citing Bryce Gardner Depo. at 13:20-23, 83:9-17).

23.     Deseret Mutual's HR Manual provides that:

It is the policy of Deseret Mutual that associates should have an opportunity to present their work-related complaints and to appeal management decisions through a dispute resolution procedure. Deseret Mutual will attempt to resolve promptly all disputes that are appropriate or handling under this policy.[27]

24.     Deseret Mutual deems "a belief that Deseret Mutual policies, practices, rules, regulations, or procedures have been applied inconsistently to an associate" to be a proper dispute.[28]

25.     Deseret Mutual also deems reprisal and harassment and discrimination to be proper disputes.[29]

26.     The HR Policy Manual further provides that "[a]ssociates are not to be penalized for proper use of the dispute resolution procedure… associates and managers are prohibited from retaliating against an associate who properly used the dispute resolution procedure."[30]

### C. Fact Relating to FMLA Retaliation and Title VII Retaliation

27.     After being hired and as soon as her training was complete, Mrs. Gardner, a native Spanish speaker, asked if she could take Spanish calls.[31]

28.     Deseret Mutual refused to allow Mrs. Gardner to taking Spanish telephone calls.[32]

---

[27] *See id.* at 42, ¶ 56 (citing HR Manual at 904 – Dispute Resolution Procedure – 09/06, DMBA00730, docket no. 20-14, filed Mar. 23, 2015).

[28] *See id.* at 42, ¶ 57 (citing HR Manual at 901 – Dispute Resolution Procedure – 09/06, Comment 1.a, DMBA00730, docket no. 20-14, filed Mar. 23, 2015).

[29] *See id.* at 42, ¶ 58 (citing HR Manual at 901 – Dispute Resolution Procedure – 09/06, Comment 1.b, 1.c, DMBA00730, docket no. 20-14, filed Mar. 23, 2015).

[30] *See id.* at 42-43, ¶ 59 (citing HR Manual at 901 – Dispute Resolution Procedure – 09/06, Comment 10, DMBA00732, docket no. 20-14, filed Mar. 23, 2015).

[31] *See id.* at 44, ¶ 67 (citing Deposition Transcript of Yohana Gardner, dated Jan. 9, 2015 ("Yohana Gardner Depo."), at 64:6-7, docket no. 20-3, filed Mar. 23, 2015).

[32] *See id.* at 44, ¶ 68 (citing Yohana Gardner Depo. at 64:6-12; Bryce Gardner Depo. at 80:16-25-81:11).

29.     At the same time, Deseret Mutual permitted non-native speakers who were hired at the same time as Mrs. Gardner, namely Chad Loveland and Cameron Solt, to take Spanish calls.[33]

30.     Deseret Mutual employees who take Spanish calls receive a salary increase.[34]

31.     Mr. Gardner was aware that Mrs. Gardner was on a committee that was referred to as the "Hispanic committee."[35]

32.     During her employment with Deseret Mutual, Mrs. Gardner attempted to apply for a promotion that was being offered.[36]

33.     Allison Bishop, Mrs. Gardner's supervisor, told her that she could not apply for the promotion because she had not been employed for more than one year.[37]

34.     However, Chad Loveland, an employee hired the same day as Mrs. Gardner, received the promotion.[38]

35.     The Gardners felt that Mrs. Gardner was being discriminated against and was receiving disparate treatment both because she was a minority and because she was pregnant and had applied for accommodation under the Family and Medical Leave Act ("FLMA").[39]

36.     Mrs. Gardner became pregnant in approximately May 2013.[40]

37.     Immediately after becoming pregnant, Mrs. Gardner began getting sick.[41]

---

[33] *See id.* at 44-45, ¶ 69 (citing Yohana Gardner Depo. at 65:17-66:5; Bryce Gardner Depo. at 80:16-81:11).

[34] *See id.* at 45, ¶ 70 (citing Yohana Gardner Depo. at 68:4-11).

[35] *See id.* at 45, ¶ 72 (citing Bryce Gardner Depo. at 24:6-8, 21-25).

[36] *See id.* at 45, ¶ 73 (citing Yohana Gardner Depo. at 76:3-13).

[37] *See id.* at 45, ¶ 74 (citing Yohana Gardner Depo. at 76:13-15).

[38] *See id.* at 45, ¶ 75 (citing Yohana Gardner Depo. at 76:17-18).

[39] *See id.* at 45, ¶ 76 (citing Yohana Gardner Depo. at 86:12-15; Bryce Gardner Depo. at 25:11-16, 42:6-8).

[40] *See id.* at 46, ¶ 83 (citing Yohana Gardner Depo. at 116:20-22).

[41] *See id.* at 46, ¶ 85 (citing Yohana Gardner Depo. at 116:23-25).

38.     Mrs. Gardner would throw up approximately three or four time a day, and it was necessary for her to spend additional time in the bathroom.[42]

39.     Due to her pregnancy, Mrs. Gardner would get sick and needed to use the bathroom more frequently in order to vomit.[43]

40.     Mrs. Gardner became especially sick in the mornings—she felt fatigue and irritability.[44]

41.     Due to her pregnancy, Mrs. Gardner was hospitalized and received IV treatment therapy in order to restore fluids to her body because she was vomiting so frequently.[45]

42.     On July 8, 2013, Mrs. Gardner submitted a Request for Family or Medical Leave to Deseret Mutual due to her pregnancy.[46]

43.     Mrs. Gardner's Request for Family or Medical Leave was granted on July 12, 2013.[47]

44.     Thereafter, Mrs. Gardner's supervisors began monitoring her every move and bathroom break.[48]

45.     Mrs. Gardner's supervisors began monitoring all the time when she logged in, went to lunch, took a break, and logged out.[49]

---

[42] See id. at 46, ¶ 86 (citing Yohana Gardner Depo. at 177:1-9).

[43] See id. at 46, ¶ 87 (citing Yohana Gardner Depo. at 177:3-9).

[44] See id. at 46, ¶ 88 (citing Bryce Gardner Depo. at 34:2-4).

[45] See id. at 46, ¶ 89 (citing Yohana Gardner Depo. at 117:19-21).

[46] See id. at 46, ¶ 90 (citing Request for Family or Medical Leave, dated July 8, 2013, DMBA00735-36, docket no. 20-5, Mar. 23, 2015).

[47] See id. at 46, ¶ 91 (citing Employer Response to Employee Request for Family or Medical Leave, dated July 12, 2013, DMBA00157-58, docket no. 20-6, filed Mar. 23, 2015).

[48] See id. at 47, ¶ 98 (citing Yohana Gardner Depo. at 86:17-20, 87:4-8; Bryce Gardner Depo. at 51:22-25).

[49] See id. at 47, ¶ 99 (citing Yohana Gardner Depo. at 88:6-9).

46.     Mrs. Gardner's supervisors would comment about the time she spent, to which she would respond that it was due to her pregnancy-related sickness and that she could not help it.[50]

47.     Mrs. Gardner's supervisors continued to send constant emails demanding updates as to where she was going, where she was, how long she was gone, and why was she gone so long.[51]

48.     Mrs. Gardner felt that she was being discriminated against and was receiving disparate treatment because she was a minority and she was pregnant.[52]

49.     Mrs. Gardner went to speak with the vice president, Jana Sybrowsky, and informed her of the behavior of her supervisors.[53]

50.     Jana Sybrowsky told Mrs. Gardner that she would look into the issue.[54]

51.     Subsequently, Jana Sybrowsky met with Mrs. Gardner and indicated that they were looking into moving her to another team so that she would not have to work under her current supervisors.[55]

52.     However, Jana Sybrowsky later informed Mrs. Gardner that she was too valuable to her team and that they would not be moving her.[56]

53.     After the meeting with Jana Sybrowsky, one of Mrs. Gardner's supervisors in particular refused to even look at her.[57]

---

[50] *See id.* at 47, ¶ 100 (citing Yohana Gardner Depo. at 152:11-13).

[51] *See id.* at 47-48, ¶ 101 (citing Yohana Gardner Depo. at 86:25-87:6, 153:6-16, 154:1-4).

[52] *See id.* at 48, ¶ 103 (citing Yohana Gardner Depo. at 86:12-15; Bryce Gardner Depo. at 25:11-16, 42:6-8).

[53] *See id.* at 48, ¶ 104 (citing Yohana Gardner Depo. at 94:12-95:1).

[54] *See id.* at 48, ¶ 105 (citing Yohana Gardner Depo. at 96:5-7).

[55] *See id.* at 48, ¶ 106 (citing Yohana Gardner Depo. at 96:11-17).

[56] *See id.* at 48, ¶ 107 (citing Yohana Gardner Depo. at 101:10-16).

[57] *See id.* at 48, ¶ 108 (citing Yohana Gardner Depo. at 105:2-5).

54.     Mrs. Gardner felt like she was on her supervisor's "target list."[58]

55.     Mrs. Gardner felt that her job was on the line.[59]

56.     On Thursday, August 1, 2013, approximately six weeks after complaining of discrimination and less than a month after applying for FMLA leave, Deseret Mutual terminated Mrs. Gardner's employment, purportedly for performance issues.[60]

57.     Mr. Gardner was notified of Mrs. Gardner's termination and allowed to escort her home.[61]

58.     The reason offered for Mrs. Gardner's termination was that for the period from May 1, 2013, through July 31, 2013, during her pregnancy and related sickness, Mrs. Gardner had intentionally disconnected 52 calls.[62]

59.     Deseret Mutual did not provide Mrs. Gardner with any documentation to support the allegation that she had intentionally dropped the calls.[63]

60.     Prior to her pregnancy, Mrs. Gardner never hung up any calls.[64]

61.     During her pregnancy, Mrs. Gardner may have disconnected one or two calls because she had to throw up into her waste basket or run to the bathroom because of her pregnancy-related sickness.[65]

---

[58] *See id.* at 48, ¶ 109 (citing Yohana Gardner Depo. at 105:2-5, 111:11-17).

[59] *See id.* at 48, ¶ 112 (citing Yohana Gardner Depo. at 108:9-11).

[60] *See* Amended Motion at 10, ¶ 21 (citing Disciplinary Termination Statement, dated Aug. 1, 2013, DMBA00001 ("Termination Statement"), docket no. 17-8, filed Jan. 28, 2015); Opposition Memorandum at 49, ¶ 113 (citing Bryce Gardner Depo. at 101:8-18; Termination Statement).

[61] *See* Amended Motion at 10, ¶ 22 (citing Bryce Gardner Depo. at 165:15-23).

[62] *See* Opposition Memorandum at 49, ¶ 114 (citing Bryce Gardner Depo. at 67:8-9; Termination Statement).

[63] *See id.* at 49, ¶ 115 (citing Yohana Gardner Depo. at 188:15-189:1).

[64] *See id.* at 49, ¶ 116 (citing Yohana Gardner Depo. at 115:22-24).

[65] *See id.* at 49, ¶ 117 (citing Yohana Gardner Depo. at 114:13-25, 116:9-10).

62.     Mrs. Gardner was not informed or warned prior to her termination that there was an issue with her number of dropped calls.[66]

63.     Mrs. Gardner was not given an opportunity or allowed to correct the alleged problem as Deseret Mutual had allowed her to do in prior instances of performance issues, such as tardies.[67]

64.     At her deposition, Mrs. Gardner testified that had she been given an opportunity to correct the issue she would have.[68]

65.     During this period, Mrs. Gardner was meeting the specified amount of calls.[69]

66.     During the same time period that Mrs. Gardner's allegedly disconnected 52 calls, a Caucasian, male employee, Chad Loveland, disconnected 333 telephone calls.[70]

67.     In a single day, June 24, 2013, Chad Loveland disconnected at least 78 telephone calls.[71]

68.     Chad Loveland was given an opportunity to correct his issues.[72]

69.     Despite his numerous dropped calls, Chad Loveland was promoted, while Mrs. Gardner was terminated.[73]

70.     Mr. Gardner believed that Deseret Mutual had discriminated against Mrs. Gardner when it refused to give her the promotion that was given to Chad Loveland, and terminated her instead.[74]

---

[66] *See id.* at 49, ¶ 118 (citing Bryce Gardner Depo. at 79:15-22).

[67] *See id.* at 49, ¶ 119 (citing Yohana Gardner Depo. at 180:20-181:3).

[68] *See id.* at 49, ¶ 120 (citing Yohana Gardner Depo. at 180:23-181:1).

[69] *See id.* at 49, ¶ 121 (citing Bryce Gardner Depo. at 55:3-7).

[70] *See id.* at 49-50, ¶ 122 (citing Bryce Gardner Depo. at 69:24-70:17, 71:18-20).

[71] *See id.* at 50, ¶ 123 (citing Bryce Gardner Depo. at 69:2-4; 124:20-125:21; Yohana Gardner Depo. at 164:1-21).

[72] *See id.* at 50, ¶ 124 (citing Bryce Gardner Depo. at 73:20-74:3).

[73] *See id.* at 50, ¶ 126 (citing Bryce Gardner Depo. at 67:11-21).

71.     Mr. Gardner was informed that Deseret Mutual had an unwritten policy not to hire pregnant women.[75]

72.     After being promoted to manager, Mr. Gardner was specifically told "Do not hire a pregnant person again" by his direct supervisory, Donna McReavy.[76]

73.     This occurred after Mr. Gardner and another manager hired a pregnant woman.[77]

74.     Deseret Mutual terminated this pregnant employee shortly after she was hired, and Mr. Gardner was called into meet with Donna McReavy and told not to hire a pregnant employee again.[78]

75.     In another instance, a pregnant employee was terminated and then denied FMLA coverage.[79]

76.     Mr. Gardner believed that there was an appearance that Mrs. Gardner was being expected to be on the phones more than others and was not allowed to take medically necessary breaks.[80]

77.     Mr. Gardner was aware that Mrs. Gardner was not given any verbal or written warnings about dropped calls prior to her termination.[81]

78.     On August 1, 2013, Mr. Gardner specifically blocked Donna McReavy and Allison Bishop from his account at www.facebook.com.[82]

---

[74] *See id*. at 50, ¶ 127 (citing Bryce Gardner Depo. at 69:12-23).

[75] *See id*. at 50, ¶ 129 (citing Bryce Gardner Depo. at 59:14-20).

[76] *See id*. at 50, ¶ 130 (citing Bryce Gardner Depo. at 59:14-20, 60:20-23).

[77] *See id*. at 50, ¶ 131 (citing Bryce Gardner Depo. at 59:14-20, 60:17-23).

[78] *See id*. at 50-51, ¶ 132 (citing Bryce Gardner Depo. at 59:14-20).

[79] *See id*. at 51, ¶ 135 (citing Bryce Gardner Depo. at 62:12-16, 66:11-18, 109:20-110:8).

[80] *See id*. at 51, ¶ 137 (citing Bryce Gardner Depo. at 55:19-24, 56:13-15, 57:3-17).

[81] *See id*. at 51, ¶ 138 (citing Bryce Gardner Depo. at 79:20-22, 80:12-15; Yohana Gardner Depo. at 180:20-181:3, 188:15-189:1); Reply Memorandum at Exhibit A, 52, Deseret Mutual's Response to Statement of Additional Fact 138 (citing Yohana Gardner Depo. at 47:15-51:9).

79.     On Monday, August 5, 2013, Mr. Gardner returned for his next day of work at Deseret Mutual.[83]

80.     Mr. Gardner requested a meeting with Deseret Mutual's General Counsel, Scott Eastmond, to express his concerns that Mrs. Gardner was being treated differently from other associates.[84]

81.     Mr. Gardner presented a three-page written document addressing his concerns to Scott Eastmond at their meeting ("Termination Concerns Document").[85]

82.     The Termination Concerns Document included a conclusion that Mrs. Gardner's termination "represents a targeted, personal, discriminative, retaliatory, wrongful termination of a pregnant minority who voiced her concern regarding inconsistencies between how she, as a minority[,] was being treated compared to those who are Caucasian."[86]

83.     During his deposition, Mr. Gardner testified as to his belief that Mrs. Gardner's managers and the Vice President of Operations "had it out" for her because she "is extremely personable, she's friendly, she's happy and everyone loved her. She does an excellent job, she's an excellent worker and both in my opinion Donna [McReavy] and Allison [Bishop] were envious and jealous of the attention [Mrs. Gardner] always received."[87]

84.     Shortly after the meeting with Scott Eastmond ended, Mr. Gardner posted the following message on www.facebook.com ("Facebook Post"):

---

[82] *See* Opposition Memorandum at 58, ¶ 191 (citing Bryce Gardner Depo. at 230:3-13).

[83] *See* Amended Motion at 10, ¶ 23 (citing Bryce Gardner Depo. at 100:25-101:8).

[84] *See id.* at 10, ¶ 24 (citing Bryce Gardner Depo. at 86:14-15).

[85] *See id.* at 10, ¶ 25 (citing Termination Concerns Document, docket no. 17-9, filed Jan. 28, 2015).

[86] *See id.* at 10, ¶ 26 (citing Termination Concerns Document, docket no. 17-9, filed Jan. 28, 2015; Bryce Gardner Depo. 31:3-4).

[87] *See id.* at 11, ¶ 27 (citing Bryce Gardner Depo. 45:13-20).

> You rue the day you mess with my family. I hear my wife in tears because of the injustice brought upon her. Believe me, justice will be served. I won't sit by idly and watch the one I love treated like garbage. **Yohana**, I love you. You are my rock, my everything. It's time to bring the rain![88]

85.     Mr. Gardner's Facebook Post was not made until the afternoon of August 5, 2013, after Mrs. Gardner called him in tears regarding a visit from a heating and cooling repairman.[89]

86.     At lunch on August 5, 2013, Mrs. Gardner called Mr. Gardner in tears.[90]

87.     Mrs. Gardner explained that her father had contacted a heating and cooling company to repair their air conditioning unit that had malfunctioned.[91]

88.     Before the repairman was scheduled to inspect the air conditioning unit, Mrs. Gardner's friend repaired the unit.[92]

89.     Mrs. Gardner's father contacted the repairman and informed him that the unit had been repaired.[93]

90.     Nonetheless, the repairman showed up and Mrs. Gardner informed him that the matter had been resolved.[94]

91.     The repairman then made derogatory, racist, sexist, and offensive comments to Mrs. Gardner and her parents.[95]

92.     The Facebook Post was seen by a number of associates and co-workers of Mr. Gardner, and was forwarded to Deseret Mutual's management.[96]

---

[88] *See id.* at 11, ¶ 28 (citing Facebook Post, docket no. 17-10, filed Jan. 28, 2015 (emphasis in original)).

[89] *See* Opposition Memorandum at 57, ¶ 177 (citing Bryce Gardner Depo. at 173:20-21, 181:15-16; Facebook Post, docket no. 17-10, filed Jan. 28, 2015).

[90] *See id.* at 57, ¶ 179 (citing Bryce Gardner Depo. at 173:20-21, 181:15-16).

[91] *See id.* at 57, ¶ 180 (citing Bryce Gardner Depo. at 172:10-23).

[92] *See id.* at 57-58, ¶ 181 (citing Bryce Gardner Depo. at 172:24-173:6).

[93] *See id.* at 58, ¶ 182 (citing Bryce Gardner Depo. at 173:6-12).

[94] *See id.* at 58, ¶ 183 (citing Bryce Gardner Depo. at 173:12-19).

[95] *See id.* at 58, ¶ 184 (citing Bryce Gardner Depo. at 173:13-19).

93.      Associates expressed their fears to Deseret Mutual managers that Mr. Gardner would seek violent retribution for the termination of Mrs. Gardner.[97]

94.      Soon after making the Facebook Post, Mr. Gardner was contacted by Jana Sybrowsky about the Facebook Post.[98]

95.      Mr. Gardner immediately removed the Facebook Post from www.facebook.com.[99]

96.      After his August 5, 2013 meeting with Scott Eastmond, Mr. Gardner began feeling hostility from his co-workers, specifically, Jana Sybrowsky, Allison Bishop, and Donna McReavy.[100]

97.      The next day, August 6, 2013, Mr. Gardner met with Jana Sybrowsky.[101]

98.      In a letter dated August 6, 2013, Mr. Gardner's supervisor, Donna McReavy, stated that Mr. Gardner's Facebook Post "did not contain an explicit threat; however, it did appear to have a veiled threat to people involved with [Mrs. Gardner's] termination. Due to the uncertainty and vagueness of the posting, it's difficult to determine his intentions. The posting could have been done for a range of reasons from venting frustration to wanting to harm people's reputations to the potential for destruction of property or physical harm."[102]

---

[96] *See* Amended Motion at 11, ¶ 29 (citing Eastmond Declaration ¶ 10; Declaration of Donna McReavy in Support of Motion for Partial Summary Judgment ("McReavy Declaration") ¶¶ 11-14, docket no. 17-2, filed Jan. 28, 2015; Declaration of Allison Bishop in Support of Motion for Partial Summary Judgment ("Bishop Declaration") ¶ 7, docket no. 17-3, filed Jan. 28, 2015).

[97] *See id.* at 11-12, ¶ 30 (citing Eastmond Declaration ¶ 11; McReavy Declaration ¶¶ 6, 13-14; Bishop Declaration ¶¶ 7-9).

[98] *See* Opposition Memorandum at 58, ¶ 186 (citing Bryce Gardner Depo. at 173:22-23).

[99] *See id.* at 58. ¶ 187 (citing Bryce Gardner Depo. at 173:24-25).

[100] *See id.* at 53, ¶ 150 (citing Bryce Gardner Depo. at 86:20-21).

[101] *See id.* at 58, ¶ 188 (citing Bryce Gardner Depo. at 174:13-22).

[102] *See id.* at 56-57, ¶ 170 (citing Letter from D. McReavy to D. Valdez, dated Aug. 6, 2013, DMBA00199, docket no. 20-9, filed Mar. 23, 2015).

99.     During his deposition, Mr. Gardner testified that it was possible the Facebook Post could be perceived as threatening to co-workers and associates at Deseret Mutual.[103]

100.     As soon as it became known that Mr. Gardner was opposing his wife's termination "[he] no longer had communications, [he] felt on an island. Despite multiple projects [he] was running [he] felt [he] couldn't even leave [his] office to use the restroom without being questioned why."[104]

101.     Allison Bishop refused to look at Mr. Gardner when she spoke to him and Jana Sybrowsky no longer spoke cordially to him.[105]

102.     Donna McReavy, who had previously been very friendly, made a complete change of attitude toward Mr. Gardner.[106]

103.     Mr. Gardner's co-workers began finding ways of circumventing him and removing him for the picture.[107]

104.     Mr. Gardner was denied assignments and supervisory roles that had been his in the past, such as the VSP project.[108]

105.     Mr. Gardner's presence became disruptive to associates at Deseret Mutual who say they feared him.[109]

106.     Deseret Mutual management hoped that Mr. Gardner would be able to return to work as normal.[110]

---

[103] *See* Amended Motion at 12, ¶ 31 (citing Bryce Gardner Depo. at 178:11-24, 179:8-12, 180:12-24).

[104] *See* Opposition Memorandum at 52, ¶ 144 (citing Bryce Gardner Depo. at 84:8-18).

[105] *See id.* at 52, ¶ 145 (citing Bryce Gardner Depo. at 93:12-19).

[106] *See id.* at 52-53, ¶ 146 (citing Bryce Gardner Depo. at 102:2-13).

[107] *See id.* at 53, ¶ 147 (citing Bryce Gardner Depo. at 96:21-24, 97:21-23, 138:16-139:4).

[108] *See id.* at 53, ¶ 148 (citing Bryce Gardner Depo. at 85:12-23).

[109] *See* Amended Motion at 12, ¶ 32 (citing Eastmond Declaration ¶ 12; McReavy Declaration ¶¶ 16-19; Bishop Declaration ¶¶ 10-14.

107.    However, at least one of Mr. Gardner's co-workers, Allison Bishop, was terrified in interactions with him, and other co-workers continued to express their fears to Deseret Mutual management.[111]

108.    On August 23, 2013, the Gardners had a meeting with Scott Eastmond and Bob Johnson regarding Mrs. Gardner's termination.[112]

109.    On August 29, 2013, Mr. Gardner met with Scott Eastmond and Bob Johnson.[113]

110.    During the August 29th meeting, Mr. Gardner acknowledged that he was having trouble with his co-workers.[114]

111.    During the August 29th meeting, Scott Eastmond and Bob Johnson stated to Mr. Gardner that "[Scott Eastmond] was going to be meeting with Layne [Sybrowsky], Andy [Almeida], and Kent [Whiting] about [Mr. Gardner] possibly moving to one of their areas because [Mr. Gardner] had mentioned to them in that meeting that [he] felt there was some hostility towards [him]."[115]

112.    Scott Eastmond proposed placing Mr. Gardner on paid administrative leave, and Mr. Gardner readily accepted.[116]

113.    Within one month after his August 5, 2013 meeting with Scott Eastmond opposing Mrs. Gardner's termination, Mr. Gardner was placed on administrative leave.[117]

---

[110] *See id.* at 12, ¶ 33 (citing Eastmond Declaration ¶ 13); Opposition Memorandum at 27-29, Gardners' Response to Statement of Fact 33 (citing Bryce Gardner Depo. at 86:14-87:18, 88:12-25, 202:21-203:10).

[111] *See* Amended Motion at 12-13, ¶ 34 (citing Eastmond Declaration ¶ 14; Bishop Declaration ¶¶ 11-15).

[112] *See* Opposition Memorandum at 53, ¶ 151 (citing Bryce Gardner Depo. at 86:24-87:18).

[113] *See id.* at 53, ¶ 152 (citing Bryce Gardner Depo. at 206:17-20).

[114] *See* Amended Motion at 13, ¶ 35 (citing Eastmond Declaration ¶ 15).

[115] *See* Opposition Memorandum at 53, ¶ 153 (citing Bryce Gardner Depo. at 202:21-203:2).

[116] *See* Amended Motion at 13, ¶ 36 (citing Eastmond Declaration ¶¶ 16-17; Bryce Gardner Depo. at 136:14-25); Opposition Memorandum at 31, Gardners' Response to Statement of Fact 36 (citing Bryce Gardner Depo. at 88:12-25, 202:21-203:2; Gardner Declaration ¶ 14; Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1, docket no. 17-13, filed Jan. 28, 2015).

114.    Deseret Mutual did not believe it could return Mr. Gardner to work as manager of enrollment and retirement.[118]

115.    Deseret Mutual did not consider it appropriate for Mr. Gardner to publicly threaten co-workers on www.facebook.com.[119]

116.    Additionally, Deseret Mutual employees indicated that they had concerns about working with Mr. Gardner because they feared for their personal safety at work and at home.[120]

117.    In Deseret Mutual's communications with Mr. Gardner, he refused to acknowledge that his Facebook Post was the source of conflict with his co-workers.[121]

118.    In September 2013, Deseret Mutual arranged a meeting with the Gardners to discuss Mr. Gardner's continued employment with Deseret Mutual.[122]

119.    On September 5, 2013, Mr. Gardner met with Scott Eastmond who informed him that Layne Sybrowsky, Andy Almeida, and Kent Whiting would all like to have him work in their divisions and asked Mr. Gardner to take some time to think about where he would like to go.[123]

120.    The next day, Mr. Gardner emailed Scott Eastmond and informed him that he would like to be transferred to client services (employer relations) with Layne Sybrowsky.[124]

---

[117] *See* Opposition Memorandum at 55, ¶ 161 (citing Bryce Gardner Depo. at 86:14-20, 88:22-25, 91:21-92:1, 210:10-12).

[118] *See* Amended Motion at 13, ¶ 37 (citing Eastmond Declaration ¶ 18); Opposition Memorandum at 32, Gardners' Response to Statement of Fact 37 (citing Bryce Gardner Depo. at 88:12-25, 202:21-203:2; Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1-2, docket no. 17-13, filed Jan. 28, 2015).

[119] *See* Amended Motion at 13, ¶ 38 (citing Eastmond Declaration ¶ 19).

[120] *See id.* at 13, ¶ 39 (citing Eastmond Declaration ¶ 20; McReavy Declaration ¶ 20; Bishop Declaration ¶¶ 9, 15).

[121] *See id.* at 13-14, ¶ 40 (citing Eastmond Declaration ¶ 21); Opposition Memorandum at 33-34, Gardners' Response to Statement of Fact 40 (citing Bryce Gardner Depo. at 173:22-25, 174:9-11, 175:16-18).

[122] *See* Amended Motion at 14, ¶ 41 (citing Eastmond Declaration ¶ 22).

[123] *See* Opposition Memorandum at 53-54, ¶ 155 (citing Bryce Gardner Depo. at 90:3-8, 209:12-16).

[124] *See id.* at 54, ¶ 156 (citing Bryce Gardner Depo. at 90:23-91:3, 209:16-19).

121.   Scott Eastmond responded "Great. I'll go ahead and get with Brad [Volmar] and Layne [Sybrowsky] and let them know."[125]

122.   Mr. Gardner's Facebook Post was not raised with him by either Scott Eastmond or Bob Johnson in their August 5, 23, 29 and September 5, 2013 meetings.[126]

123.   On September 9, 2013, Mr. Gardner send Scott Eastmond a follow up email to coordinate his transfer, Scott Eastmond responded that "after further consideration this morning … we want to emphasize a desire to resolve both sides of this equation (i.e., both your situation and [Mrs. Gardner's]) at the same time. … [Bob Johnson] and I believe it is in everyone's best interest to achieve resolution of these issues before you return."[127]

124.   Mr. Gardner believed that Deseret Mutual was "angry that [he] pointed out its inconsistent disciplinary standards and instead of addressing those inconsistent disciplinary standards it attempted to paint [him] as this person who's horrible—to horriblize [*sic*] [him], to assassinate [his] character, if you will, and put smoke and mirrors up to the reason why [they] found [themselves] in this situation, which was the termination of a pregnant minority."[128]

125.   On October, 1, 2013, represented by counsel, the parties met and negotiated a resolution that included transferring Mr. Gardner to another division of the company where he would not directly interact with the associates on the enrollment or customer service teams.[129]

126.   Deseret Mutual believed this transfer of Mr. Gardner was necessary.[130]

---

[125] *See id*. at 54, ¶ 157 (citing Bryce Gardner Depo. at 91:5-7, 209:23-24).

[126] *See id*. at 54, ¶ 158 (citing Gardner Declaration ¶¶ 12-14).

[127] *See id*. at 54, ¶ 159 (citing Email from S. Eastmond to B. Gardner, dated Sept. 9, 2013, GNR00174, docket no. 20-10, filed Mar. 23, 2015; Bryce Gardner Depo. at 91:21-92:1, 210:10-12).

[128] *See id*. at 59, ¶ 194 (citing Bryce Gardner Depo. at 223:14-23).

[129] *See* Amended Motion at 14, ¶ 42 (citing Eastmond Declaration ¶¶ 23, 25); Opposition Memorandum at 59, ¶ 195 (citing Bryce Gardner Depo. at 210:20-25).

[130] *See* Amended Motion at 14, ¶ 43 (citing Eastmond Declaration ¶ 24); Opposition Memorandum at 35, Gardners' Response to Statement of Fact 43 (citing Bryce Gardner Depo. 91:23-92:1, 202:21-203:2, 210:9-12).

127.    A few days later, on October 3, 2013, the Gardners' counsel withdrew Mr. Gardner's acceptance of this resolution and indicated that "Mr. Gardner wishe[d] to return to his same position right away."[131]

128.    On October 4, 2013, Deseret Mutual's counsel responded and informed the Gardners' counsel that Mr. Gardner would remain on paid administrative leave while it continued to assess the unique issues presented by Mr. Gardner's situation.[132]

129.    On October 7, 2013, Deseret Mutual sent another letter to the Gardners' counsel, which highlighted that it had "serious concerns regarding Mr. Gardner's workplace behavior following the termination of Mrs. Gardner. It is critical to [Deseret Mutual] that Mr. Gardner appreciate that his inappropriate Facebook [P]ost … [was] not acceptable to [Deseret Mutual]. … This concern may be exacerbated as a consequence of the actions [Mrs. Gardner] may or may not take against [Deseret Mutual] for termination of her employment."[133]

130.    Mr. Gardner viewed this statement as an admission that he was being terminated due to his and Mrs. Gardner's opposition to her termination by Deseret Mutual.[134]

131.    Deseret Mutual emphasized that "[t]o be clear, Mr. Gardner's return to work cannot unduly disrupt the work environment or other employees."[135]

---

[131] *See* Amended Motion at 14, ¶ 44 (citing Email from T. Olsen to B. Johnson, dated Oct. 3, 2013, docket no. 17-11, filed Jan. 28, 2015).

[132] *See id.* at 14, ¶ 45 (citing Letter from B. Johnson to T. Olsen, dated Oct. 4, 2013, docket no. 17-12, filed Jan. 28, 2015); Opposition Memorandum at 36-37, Gardners' Response to Statement of Fact 45 (citing Letter from B. Johnson to T. Olsen, dated Oct. 4, 2013, docket no. 17-12, filed Jan. 28, 2015).

[133] *See* Amended Motion at 14, ¶ 46 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1, docket no. 17-13, filed Jan. 28, 2015); Opposition Memorandum at 55, ¶ 163 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1, docket no. 17-13, filed Jan. 28, 2015).

[134] *See* Opposition Memorandum at 59, ¶ 198 (citing Gardner Declaration ¶ 15).

[135] *See* Amended Motion at 15, ¶ 47 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1, docket no. 17-13, filed Jan. 28, 2015).

132.    Deseret Mutual expressed its concern that "Mr. Gardner is unwilling to sign an acknowledgement and release reflecting his understanding of these issues."[136]

133.    Deseret Mutual indicated that it was going "to consider Mr. Gardner's continued employment based on its budgetary needs and its comfort level with Mr. Gardner's behavior on a go-forward basis."[137]

134.    Mr. Gardner viewed these statements as pretext for terminating him for opposing his wife's termination.[138]

135.    Deseret Mutual indicated that it would like to speak with the Gardner's counsel regarding these issues, requested a time for a telephone call, and stated that Mr. Gardner would remain on paid administrative leave through October 2013.[139]

136.    Deseret Mutual never received a response to its October 7, 2013 letter.[140]

137.    Deseret Mutual terminated Mr. Gardner's employment at the company on October 31, 2013, purportedly for the expiration of his paid administrative leave expired without further attempt on his part to discuss or reach an acceptable resolution.[141]

## STANDARD OF REVIEW

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[142] A factual dispute is genuine when

---

[136] *See id*. at 15, ¶ 48 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1, docket no. 17-13, filed Jan. 28, 2015).

[137] *See* Opposition Memorandum at 59-60, ¶ 199 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, docket no. 17-13, filed Jan. 28, 2015).

[138] *See id*. at 60, ¶ 201 (citing Bryce Gardner Depo. at 221:22-222:7).

[139] *See* Amended Motion at 15, ¶ 49 (citing Letter from B. Johnson to T. Olsen, dated Oct. 7, 2013, at 1-2, docket no. 17-13, filed Jan. 28, 2015).

[140] *See id*. at 15, ¶ 50 (citing Eastmond Declaration ¶ 26).

[141] *See id*. at 15, ¶ 52 (citing Eastmond Declaration ¶ 27); Opposition Memorandum at 39-40, Gardners' Response to Statement of Fact 52 (citing Bryce Gardner Depo at 84:8-18, 85:12-23, 86:20-87:18, 174:13-22, 202:21-203:2, 210:9-12).

"there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way."[143] In determining whether there is a genuine dispute as to material fact, the district court should "view the factual record and draw all reasonable inferences therefrom most favorably to the nonmovant."[144]

The moving party "bears the initial burden of making a prima facie demonstration of the absence of a genuine issue of material fact and entitlement to judgment as a matter of law."[145]

## DISCUSSION

### A. No Triable Issue of Fact Exists as to the Gardners' Breach of Contract Claim and the Claim Fails as a Matter of Law

Deseret Mutual's Amended Motion on the Gardners' breach of contract claim (Sixth Cause of Action) depends on Mr. Gardner's employment relationship with Deseret Mutual. "The elements of a prima facie case for breach of contract are (1) a contract, (2) performance by the party seeking recovery, (3) breach of the contract by the other party, and (4) damages."[146]

Deseret Mutual maintains that Mr. Gardner was an at-will employee who could be terminated at any time, for any reason, with or without cause or notice. To support its position, Deseret Mutual relies on the express language of the Employment Statement that Mr. Gardner read and signed when he began working at Deseret Mutual and on its HR Manual. Deseret Mutual argues that these documents expressly establish that Mr. Gardner's employment was at-will and prevent any written term or oral representation from creating a contrary implied-in-fact

---

[142] Fed. R. Civ. P. 56(a).

[143] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998).

[144] *Id.*

[145] *Id.* at 670-71.

[146] *Bair v. Axiom Design, L.L.C.*, 2001 UT 20, ¶ 14, 20 P.3d 388.

contract. Deseret Mutual therefore submits that its termination of Mr. Gardner's employment cannot constitute a breach of contract as a matter of law.

The Gardners, on the other hand, contend that the disciplinary policies and procedures contained in Deseret Mutual's employee handbook establish implied-in-fact contract terms precluding termination absent a prior verbal warning, followed by a written warning, and then by discipline short of termination. The Gardners use Mr. Gardner's deposition testimony that Deseret Mutual always followed this disciplinary process as support for their position. Accordingly, the Gardners argue that Deseret Mutual breached Mr. Gardner's employment contract when it terminated his employment without following its established disciplinary process.

"An employment relationship for an indefinite term gives rise to a presumption that the employment relationship is at will."[147] "Such a relationship allows both the employer and the employee to terminate the employment for any reason and allows the employer to do so without extending any procedural safeguards to an employee."[148] However, an employee "may overcome this presumption by showing that the parties created an implied-in-fact contract, modifying the employee's at-will status."[149]

"The existence of such an [implied-in-fact] agreement is a question of fact which turns on the objective manifestations of the parties' intent and is primarily a jury question."[150] However, the district court "may properly determine the existence of an implied contract as a matter of law if no reasonable jury could find such a contract and if the evidence relied on by the parties

---

[147] *Tomlinson v. NCR Corp.*, 2014 UT 55, ¶ 11, 345 P.3d 523.

[148] *Id*. (internal quotations omitted).

[149] *Id*. (internal quotations omitted).

[150] *Id*. ¶ 12 (internal quotations and punctuation omitted).

presents no triable issues of fact."[151] "Evidence of an implied contact must meet the

requirements for an offer of a unilateral contract."[152] "Accordingly, the employer must

communicate a manifestation of intent to the employee that is sufficiently definite to constitute a

contract provision."[153] "[T]he manifestation of the employer's intent must be of such a nature

that the employee can reasonably believe that the employer is making an offer of employment

other than employment at will."[154] "Relevant evidence of the parties' intent may include

announced personnel policies, employment manuals, the course of conduct between the parties,

and relevant oral representations."[155]

     The Employment Statement that Mr. Gardner read and signed when he began working at

Deseret Mutual expressly provides that his employment was at-will:

> I understand and agree that I have received no promise from Deseret Mutual
> regarding potential length of employment or promotion of any kind, I further
> understand that I have the right to terminate my employment at any time and that
> Deseret Mutual retains a similar right.[156]

Deseret Mutual's HR Manual also sets forth multiple express statements that Deseret Mutual's

employees are at-will employees, unless the employee has a separate written employment

contact. Specifically, Policy 106, titled "Employment-At-Will," provides:

> It is the policy of Deseret Mutual that all associates who do not have a written
> employment contract with Deseret Mutual for a specific, fixed term of
> employment are employed at the will of Deseret Mutual for an indefinite
> period.[157]

Comment 1 to Policy 106 further clarifies the at-will nature of Deseret Mutual's employees:

---

[151] *Id.*

[152] *Id.* ¶ 13 (internal quotations omitted)

[153] *Id.*

[154] *Johnson v. Morton Thiokol, Inc.*, 818 P.2d 997, 1002 (Utah 1991).

[155] *Tomlinson*, 2014 UT 55, ¶ 12.

[156] *See supra*, Undisputed Material Facts ¶¶ 11-12.

[157] *See id.* ¶ 14.

> Associates who do not have a separate, individual written employment contract are employed at the will of Deseret Mutual and are subject to termination at any time, for any reason, with or without cause or notice.[158]

Additionally, Policy 211, title "Termination of Employment," provides:

> In the absence of a specific written agreement, associates are free to resign at any time and for any reason and Deseret Mutual reserves the right to terminate employment at any time and for any reason.[159]

It is undisputed that Mr. Gardner, as a manager and supervisor of employees, was aware of and familiar with Deseret Mutual's employment practices and its hiring and discipline practices.[160] It is also undisputed that Mr. Gardner understood the terms of Policy 106 and that his employment was at-will.[161] The Gardners, nevertheless, argue that Deseret Mutual created an implied-in-fact modification to Mr. Gardner's at-will employment status by promoting him to enrollment and retirement manager and by requiring its managers to always follow a disciplinary process prior to termination that included a verbal warning, then a written warning and discipline.

There is no direct evidence to support the Gardners' argument that Mr. Gardner's promotion somehow altered his at-will employment status. Nor do the undisputed material facts and competent evidence presented support a reasonable inference that Mr. Gardner's promotion altered his at-will employment status. Rather, the clear and plain language of Mr. Gardner's Employment Statement and Policies 106 and 211 of Deseret Mutual's HR Manual demonstrate that in the absence of an separate written employment contact, Mr. Gardner's employment with Deseret Mutual was at-will at the time of his hiring and remained at-will following his

---

[158] *See id.* ¶ 15.

[159] *See id.* ¶ 18.

[160] *See id* ¶ 21.

[161] *See id.* ¶¶ 19-20.

promotion.[162] The Gardners have failed to present sufficient competent evidence of any express

or implied statement within Deseret Mutual's employee handbook materials, or any oral

statement of policy, suggesting that a modification of Mr. Gardner's at-will employment status

occurred. Mr. Gardner's deposition testimony that Deseret Mutual always followed a certain

disciplinary process is self-serving and insufficient to implicate a communicated manifestation of

intent on the part of Deseret Mutual, such that Mr. Gardner could reasonably believe that Deseret

Mutual was making an offer of employment other than employment at-will.[163] This is

particularly true in light of the clear and conspicuous disclaimer of contract liability within Mr.

Gardner's Employment Statement and Deseret Mutual's HR Manual.

"An implied-in-fact promise cannot, of course, contradict a written contract term."[164]

Additionally, "Utah law allows employers to disclaim any contractual relationship that might

otherwise arise from employee manuals."[165] "When an employee handbook contains a clear and

conspicuous disclaimer of contractual liability, any other agreement terms must be construed in

the light of the disclaimer."[166] Therefore, "a clear and conspicuous disclaimer, as a matter of law,

prevents employee manuals or other like material from being considered as implied-in-fact

contract terms."[167] "The prominence of the text, the placement of the disclaimer, and the

language of the disclaimer are all relevant factors in determining whether a disclaimer is clear

and conspicuous."[168]

---

[162] *See id.* ¶¶ 12, 14, 15, 18.

[163] *See id.* ¶ 22.

[164] *Berube v. Fashion Ctr., Ltd.*, 771 P.2d 1033, 1044 (Utah 1989).

[165] *Tomlinson*, 2014 UT 55, ¶ 25

[166] *Id.* (internal quotations omitted).

[167] *Id.* (internal quotations omitted).

[168] *Id.* ¶ 26.

Mr. Gardner's Employment Statement, signed February 21, 2006, as he started work at Deseret Mutual, is a one-page document consisting of eight bulleted paragraphs.[169] The third bulleted paragraph contains a disclaimer of contract liability:

> I agree and understand that the contents of this handbook and all Deseret Mutual manuals dealing with employment policies are presented as a matter of information only and are not to be understood or construed as a promise or contract between Deseret Mutual and its employees.[170]

It is undisputed that Mr. Gardner read and understood the document.[171]

The disclaimer of contract liability is also restated in Policy 102 of Deseret Mutual's HR Manual, titled "Functions of Human Resources Policies," which provides:

> It is the policy of Deseret Mutual that its human resources Policies are to be used as an outline of the basic Human Resources practices and procedures for Deseret Mutual. They are not intended to alter the employment-at-will relationship in any way. (See Employment-At-Will, Policy 106.)[172]

Comment 2 of Policy 106 then clarifies that the disclaimer of contract liability cannot be modified orally or in writing by a Deseret Mutual representative:

> No Deseret Mutual representative is authorized to modify this policy for any associate or to enter into any agreement, oral or written, that changes the at-will relationship.[173]

Comments 3 of Policy 106 further clarifies that Deseret Mutual's policies may not, collectively or individually, be construed as creating an express or implied contract that modifies the at-will employment status of its employees:

> This policy may not be modified by any statements contained elsewhere in Deseret Mutual Human Resources policies, or any other associate handbooks, employment applications, Deseret Mutual recruiting materials, Deseret Mutual memoranda, or other materials provided to applicants and associates in

---

[169] *See* Employment Statement.

[170] *See supra*, Undisputed Material Facts ¶ 12.

[171] *See supra*, Undisputed Material Facts ¶ 11.

[172] *See id*. ¶ 13 (emphasis in original).

[173] *See id*. ¶ 15.

connection with their employment. None of these documents, whether singly or combined, create an express or implied contract of employment for a definite period, … or an express or implied contract concerning any terms or conditions of employment. Similarly, Deseret Mutual policies and practices with respect to any matter are not to be considered as creating any contractual obligation on Deseret Mutual's part or as stating in any way that termination will occur only for "just cause." Statements of specific grounds for termination set forth in Human Resources policies or in any other Deseret Mutual documents are examples only, not all-inclusive lists, and are not intended to restrict Deseret Mutual's right to terminate at will.[174]

It is undisputed that Mr. Gardner was aware of and familiar with these policies, and that he understood these policies.[175]

The actual text of Deseret Mutual's disclaimer of contract liability in Mr. Gardner's Employment Statement was no more or less prominent then the text of other provisions in the Employment Statement.[176] Similarly, the actual text of disclaimer of contract liability in Deseret Mutual's HR Manual was no more or less prominent then the text of other policies and comments within the HR Manual.[177] However, the headings of Policy 102, "Functions of Human Resources Policies," and Policy 106, "Employment-At-Will," where the restatement of the disclaimer of contract liability is found and discussed in the HR Policy Manual, are prominently displayed in bolded, large size font.[178] The reference to the heading of Policy 106 within the text of Policy 102 is also prominently displayed with underlining.[179]

The multiple placements of Deseret Mutual's disclaimer of contract liability in Mr. Gardner's Employment Statement and the HR Manual further add to the disclaimer's conspicuous nature. Moreover, the plain language of the disclaimer of contract liability in each

---

[174] *See id.* ¶ 16.

[175] *See id* ¶¶ 19, 21.

[176] *See* Employment Statement.

[177] *See* HR Manual, docket no. 17-7, filed Jan. 28, 2015; HR Manual, docket no. 20-14, filed Mar. 23, 2015.

[178] *See* HR Manual, docket no. 17-7, filed Jan. 28, 2015.

[179] *See id.*

placement is clear, consistent, and unambiguous. Accordingly, Deseret Mutual's disclaimer of contract liability, coupled with Mr. Gardner's undisputed familiarity and understanding of the documents and policies that contain the disclaimer, prevent Deseret Mutual's employee handbook materials from creating implied-in-fact contract terms that modified Mr. Gardner's at-will employment status as a matter of law.[180]

In the absence of any competent evidence of an express, written employment contract for a duration other than an indefinite term between Mr. Gardner and Deseret Mutual, and in the absence of sufficient competent evidence suggesting a manifestation of Deseret Mutual's intent to create an implied-in-fact contract for a duration other than an indefinite term regarding Mr. Gardner's employment, no triable issue of fact exists as to whether Mr. Gardner's employment was anything other than at-will. Given the undisputed material facts and the competent evidence presented, no reasonable jury could find the existence of an implied-in-fact contract for a duration other than an indefinite term between Mr. Gardner and Deseret Mutual. As such, Mr. Gardner's employment at Deseret Mutual was at-will and Deseret Mutual could terminate his employment at any time, for any reason, with or without cause or notice.[181] The Gardners' breach of contract claim (Sixth Cause of Action) therefore fails as a matter of law.

### B. Because No Employment Contract for a Duration Other Than an Indefinite Term Existed Between Mr. Gardner and Deseret Mutual, the Gardners' Breach of Covenant of Good Faith and Fair Dealing Claim Fails as a Matter of Law

Under Utah law, "[a]n implied covenant of good faith and fair dealing inheres in every contact."[182] "Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to intentionally do anything to injure the other party's right to receive the

---

[180] *See Tomlinson*, 2014 UT 55, ¶ 25.

[181] *See id.* ¶ 11.

[182] *Eggett v. Wasatch Energy Corp.*, 2004 UT 28, ¶ 14, 94 P.3d 193.

benefits of the contact."[183] "Such a covenant cannot be construed, however, to establish new,

independent rights or duties not agreed upon by the parties."[184] "Nor can a covenant of good

faith be used to nullify a right granted by a contract to one of the parties or to require a party

vested with a contract right to exercise that right in a manner contrary to that party's legitimate

self-interest."[185]

> In the employment contract context,
>
> in the absence of express terms limiting the right of an employer to discharge for
> any or no reason and in the absence of provisions establishing procedures by
> which a discharge should be effectuated, it would be inconsistent to hold that an
> employer, on the basis of the implied covenant of good faith, is bound to a
> substantive limitation on the employer's right to discharge.[186]

In other words, the implied covenant of good faith and fair dealing "cannot be construed to

change an indefinite-term, at-will employment contract into a contract that requires an employer

to have good cause to justify a discharge."[187]

The undisputed material facts establish, as a matter of law, that no express or implied-in-

fact employment contract for a duration other than an indefinite term existed between Mr.

Gardner and Deseret Mutual. Mr. Gardner's employment at Deseret Mutual was therefore at-will

and Deseret Mutual had the right to terminate his employment at any time, for any reason, with

or without cause or notice.[188] Accordingly, because the implied covenant of good faith and fair

dealing cannot be construed to alter Deseret Mutual's right to terminate Mr. Gardner at-will,[189]

---

[183] *Id.*

[184] *Brehany v. Nordstrom, Inc.*, 812 P.2d 49, 55 (Utah 1991).

[185] *Id.*

[186] *Id.*

[187] *Id.*

[188] *See Tomlinson*, 2014 UT 55, ¶ 11.

[189] *See Brehany*, 812 P.2d at 55.

the Gardners' breach of covenant of good faith and fair dealing (Seventh Cause of Action) fails

as a matter of law.

### C.  The Existence of Genuine Disputes of Material Fact Precludes Summary Judgment on the Gardners' FMLA Retaliation and Title VII Retaliation Claim

"Both FMLA retaliation and Title VII [retaliation] claims are subject to the burden

shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct.

1817, 36 L.Ed.2d 668 (1973)."[190] "Under this framework, the plaintiff bears the initial burden of

establishing a prima face case."[191] "To state a prima facie case of retaliation, [a plaintiff] must

show that: (1) [he] engaged in a protected activity; (2) [the defendant] took an action that a

reasonable employee would have found materially adverse; and (3) there exists a causal

connection between the protected activity and the adverse action."[192]

**First Element.** The FMLA prohibits employers from "discharg[ing] or in any other

manner discriminat[ing] against any individual for opposing any practice made unlawful by [the

FMLA]."[193] Opposing an employer's practice of discriminating against employees having

serious medical conditions or retaliating against employees for taking FMLA leave is a protected

activity under the FMLA.[194] Similarly, Title VII prohibits employers from discriminating against

an employee "because [the employee] has opposed any practice made an unlawful employment

practice by [Title VII.]"[195] Opposing an employer's practice of race or gender discrimination is a

protected activity under Title VII.[196]

---

[190] *Wright v. City of Topeka, Kan.*, 547 Fed.Appx. 861, 863 (10th Cir. 2013).

[191] *Id.*

[192] *Metzler v. Federal Home Loan Bank of Topeka*, 464 F.3d 1164, 1171 (10th Cir. 2006).

[193] 29 U.S.C.A. § 2615(a)(2).

[194] *See Twigg v. Hawker Beechcraft Corp.*, 659 F.3d 987, 1005-07 (10th Cir. 2011).

[195] 42 U.S.C.A. § 2000e-3(a).

[196] *See Bennett v. Windstream Commc'ns, Inc.*, 30 F.Supp.3d 1243, 1254 (10th Cir. 2014).

**Second Element.** A materially adverse employment action includes actions that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination [or opposing a discriminatory employment practice]."[197] This could include reassignment of job duties, depending on the circumstances of the particular case, or termination of employment.[198] A materially adverse employment action, however, does not include "those petty slights of minor annoyances that often take place at work and that all employees experience."[199]

**Third Element.** "For purposes of establishing a prima facie case of retaliation, a plaintiff can establish a causal connection by temporal proximity between the protected activity and adverse action."[200] However, "a plaintiff may rely on temporal proximity alone only if the termination is *very closely* connected in time to the protected activity."[201] "The 'critical inquiry' at this prima facie state is whether the plaintiff has demonstrated that the employer's action occurred under circumstances which give rise to an inference of unlawful discrimination."[202]

**Burden Shift—Legitimate Reason.** After the plaintiff has established a prima facie case of retaliation, "[t]he burden then shifts to the employer to articulate a legitimate, nondiscriminatory (or non-retaliatory) reason for the employment decision."[203] "Th[is] inquiry is not whether the stated reasons were fair, wise, or correct, but rather whether [the employer]

---

[197] *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405 (2006) (internal quotations omitted).

[198] *Id*. at 71.

[199] *Id*. at 68.

[200] *Fye v. Oklahoma Corp. Comm'n*, 516 F.3d 1217, 1228 (10th Cir. 2008).

[201] *Metzler*, 464 F.3d at 1171 (internal quotations omitted, emphasis in original).

[202] *Id*. (internal quotations omitted).

[203] *Wright*, 547 Fed.Appx. at 863.

genuinely believed them and took action accordingly."[204] The district court's "role is not to second guess an employer's business judgment."[205]

**Burden Shift—Pretext.** "The plaintiff then bears the ultimate burden of demonstrating that the defendant's proffered reason is pretextual."[206] "To show pretext, [a plaintiff] must produce evidence of such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons."[207] "Mere conjecture that the employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment."[208] However, on summary judgment, a "plaintiff need not prove that discrimination or retaliation was the [employer's] actual motivation[.]"[209] "So long as the plaintiff has presented evidence of pretext (by demonstrating that the defendant's proffered non-discriminatory reason is unworthy of belief) upon which a jury could infer discriminatory motive, the case should go to trial."[210] "Judgments about intent are best left for trial and are within the province of the jury."[211]

## I.     Prima Facie Case Established

Viewing the undisputed evidence and all reasonable inferences in a light most favorable to the Gardners, genuine disputes of material fact preclude summary judgment on their FMLA

---

[204] *Id.*

[205] *Stover v. Martinez*, 382 F.3d 1064, 1076 (10th Cir. 2004).

[206] *Metzler*, 464 F.3d at 1170.

[207] *Argo v. Blue Cross and Blue Shield of Kansas, Inc.*, 452 F.3d 1193, 1203 (10th Cir. 2006) (internal quotations omitted).

[208] *Morgan v. Hilti, Inc.*, 108 F.3d 1319, 1323 (10th Cir. 1997) (internal quotations omitted).

[209] *Wright*, 547 Fed.Appx. at 863.

[210] *Randle v. City of Aurora*, 69 F.3d 441, 453 (10th Cir. 1995).

[211] *Id.*

retaliation and Title VII retaliation claim (Fourth Cause of Action). For purposes of summary judgment, the Gardners have established a prima facie case of retaliation under the FMLA and Title VII regarding Deseret Mutual's employment decisions relating to Mr. Gardner. Mr. Gardner perceived and believed that Deseret Mutual implemented practices involving discrimination and retaliation against employees having serious medical conditions or for taking FMLA leave, and discrimination based on race and gender, specifically with Mrs. Gardner's treatment and termination.[212] Shortly after Mrs. Gardner's termination, Mr. Gardner voiced his opposition to these perceived employment practices to Deseret Mutual's management.[213] Mr. Gardner's opposition constitutes protected activity under the FMLA and Title VII for purposes of summary judgment.[214]

After it became know that Mr. Gardner voiced his opposition to Mrs. Gardner's treatment and termination to Deseret Mutual's management, he began feeling hostility from his co-workers and was circumvented on work projects and assignments he previously received.[215]  Within one month of voicing his opposition, Deseret Mutual informed Mr. Gardner of its intent to transfer him to another division and placed him on paid administrative leave.[216] Deseret Mutual then informed Mr. Gardner that it desired to resolve both his and Mrs. Gardner's issues at the same time and before he could return to work.[217] Two months later, after Mr. Gardner withdrew his agreement to a negotiated settlement and indicated his desire to return to his original position,

---

[212] *See supra*, Undisputed Material Facts ¶¶ 28-29, 3, 33-35, 39, 42-45, 47, 49, 53, 56, 58, 62-63, 66-72, 76.

[213] *See id*. ¶¶ 80-82.

[214] *See Twigg*, 659 F.3d at 1005-07; *Bennett*, 30 F.Supp.3d at 1254.

[215] *See supra*, Undisputed Material Facts ¶¶ 96, 100-104, 110.

[216] *See id*. ¶¶ 111-113.

[217] *See id*. ¶ 123.

Deseret Mutual terminated his employment.[218] Under these circumstances and for purposes of summary judgment, Deseret Mutual's proposed reassignment of Mr. Gardner, its placing him on paid administrative leave, and its termination of his employment constitute materially adverse employment actions.[219] Additionally, given the proximity of time between Mr. Gardner's opposition and the employment actions taken by Deseret Mutual, as well as Deseret Mutual's indication that Mr. Gardner could not return to work until both his and Mrs. Gardner's issues were resolved, there exists a causal connection between Mr. Gardner's protected activity and Deseret Mutual's employment actions for purposes of summary judgment.[220]

## II.      Burden Shift—Legitimate Reason

Because the Gardners established a prima facie case of FMLA retaliation and Title VII retaliation, the burden shifts to Deseret Mutual to "articulate a legitimate, nondiscriminatory (or non-retaliatory) reason for the employment decision."[221] Through the undisputed material facts, Deseret Mutual has presented evidence suggesting that the hostility Mr. Gardner felt from co-workers and its decision to transfer Mr. Gardner and place him on administrative leave stemmed from his Facebook Post.[222] It is undisputed that Mr. Gardner's co-workers saw the Facebook Post; feared it was a threat against them; and reported their concerns to Deseret Mutual management.[223] Soon after Mr. Gardner made the Facebook Post, Deseret Mutual contacted him

---

[218] *See id.* ¶¶ 125, 127-128, 137.

[219] *See White*, 548 U.S. at 71.

[220] *See Metzler*, 464 F.3d at 1171

[221] *Wright*, 547 Fed.Appx. at 863.

[222] *See supra*, Undisputed Material Facts ¶¶ 84, 92-95, 97-99, 105, 107, 110-112, 114-116, 123, 125-126, 128-129, 131-132, 133, 135.

[223] *See id.* ¶¶ 92-93, 96, 98, 105, 107, 110-112, 116.

about it and it was removed immediately thereafter.[224] Mr. Gardner also acknowledged that the Facebook Post could be perceived as threatening to his co-workers.[225]

Deseret Mutual further presented evidence through the undisputed material facts that its decision to terminate Mr. Gardner's employment resulted from the expiration of his paid administrative leave without further attempt on his part to resolve the situation caused by his Facebook Post.[226] Deseret Mutual did not consider it appropriate for Mr. Gardner to publicly threaten his co-workers and Mr. Gardner refused to acknowledge that the Facebook Post was the source of his conflict with co-workers.[227] Because of Mr. Gardner's disruptive presence, Deseret Mutual believed it was necessary that he be transferred to another division.[228] However, Mr. Gardner withdrew his acceptance of the negotiated settlement and indicated his desire to return to his original position.[229] Mr. Gardner then made no further efforts to communicate with Deseret Mutual prior to the expiration of his paid administrative leave, despite Deseret Mutual's request for further discussion of the issues.[230] Deseret Mutual has, on this record, sufficiently articulated a legitimate, nondiscriminatory and nonretaliatory basis for its employment actions.[231]

### III.     Burden Shift—Pretext

Accordingly, to avoid summary judgment on their FMLA retaliation and Title VII retaliation claim (Fourth Cause of Action), the Gardners bear the burden of presenting evidence

---

[224] *See id.* ¶¶ 94-95.

[225] *See id.* ¶ 99.

[226] *See id.* ¶¶ 105, 111, 114-117, 123, 125-129, 131-133, 135-137.

[227] *See id.* ¶¶ 115, 117, 129, 132.

[228] *See id.* ¶¶ 105, 111, 114, 126

[229] *See id.* ¶ 127.

[230] *See id.* ¶¶ 135-136.

[231] *Wright*, 547 Fed.Appx. at 863; *Stover*, 382 F.3d at 1076.

that Deseret Mutual's proffered reasons for its employment actions are pretextual.[232] To demonstrate pretext, the Gardners rely on the timing of Deseret Mutual's employment actions in relation to Mr. Gardner voicing opposition to Mrs. Gardner's treatment and terminations and his Facebook Post. "[T]emporal proximity is one relevant factor to be considered by the courts in determining whether the employer's explanation is a pretext for retaliation[.]"[233] However, "even 'very close' temporal proximity" alone cannot "operate as a proxy for the evidentiary requirement" sufficient for a plaintiff to demonstrate pretext.[234] "To raise a fact issue of pretext, [a plaintiff] must … present evidence of temporal proximity *plus* circumstantial evidence of retaliatory motive."[235] Thus, the Gardners also rely on the hostility Mr. Gardner felt from co-workers once it was known he voiced opposition, as well as Deseret Mutual's statement that Mr. Gardner could not return to work until the issues with Mrs. Gardner's termination were resolved as demonstrating Deseret Mutual's retaliatory motive. Viewing the undisputed material facts and all reasonable inferences drawn therefrom in a light most favorable to the Gardners, whether Deseret Mutual's proffered reasons for its employment actions relating to Mr. Gardner are pretextual is in genuine dispute and a triable issue.[236]

The undisputed material facts demonstrate that Mr. Gardner made the Facebook Post in the afternoon on August 5, 2013, the same day he voiced his opposition to Ms. Gardner's treatment and termination to Deseret Mutual management.[237] Mr. Gardner maintains that he directed the Facebook Post at the actions of a heating and cooling repairman that visited his

---

[232] *See Metzler*, 464 F.3d at 1170.

[233] *Id.* at 1172.

[234] *Id.* (internal quotations omitted).

[235] *Id.* (emphasis in original).

[236] *See Argo*, 452 F.3d at 1203; *Randle*, 69 F.3d at 453.

[237] *See supra*, Undisputed Material Facts ¶¶ 79-82, 84-85.

home earlier that day, not Deseret Mutual and his co-workers.[238] Mr. Gardner immediately removed the Facebook Post that day after being contacted by Jana Sybrowsky.[239] After August 5, 2013, Mr. Gardner began feeling hostility from his co-workers and was circumvented on work projects and assignments he previously received.[240] A genuine dispute exists as to whether the hostility Mr. Gardner felt stemmed from his co-workers' fears associated with the Facebook Post or from their knowledge of Mr. Gardner's opposition to Deseret Mutual's treatment and termination of Mrs. Gardner.

Additionally, it was not until August 29, 2013, approximately three weeks after the Facebook Post and within one week after a meeting between the Gardners and Deseret Mutual regarding Mrs. Gardner's termination, that Deseret Mutual proposed transferring Mr. Gardner to another division and placed him on paid administrative leave.[241] The Facebook Post was not discussed in the August 5, 23, 29 and September 5, 2013 meetings between Mr. Gardner and Scott Eastmond and Bob Johnson.[242] A genuine dispute exists as to the underlying reason for the employment actions Deseret Mutual took at the August 29, 2013 meeting with Mr. Gardner.

The undisputed material facts further demonstrate that on September 9, 2013, Deseret Mutual informed Mr. Gardner that it desired to resolve both his and Mrs. Gardner's issues at the same time and before he could return to work.[243] In its last written communication with Mr. Gardner before his termination, Deseret Mutual highlighted that its concerns with Mr. Gardner's continued employment "may be exacerbated as a consequence of the actions [Mrs. Gardner] may

---

[238] *See id.* ¶¶ 85-91.

[239] *See id.* ¶¶ 94-95.

[240] *See id.* ¶¶ 96, 100-104, 110.

[241] *See id.* ¶¶ 108-113.

[242] *See id.* ¶ 122.

[243] *See id.* ¶ 123.

or may not take against [Deseret Mutual] for termination of her employment."[244] A genuine dispute exists as to the reason for Mr. Gardner's termination. Was it his continued opposition to Mrs. Gardner's treatment and termination or was it the expiration of his paid administrative leave without further attempt on his part to resolve the situation caused by his Facebook Post?

Given these genuine disputes of material fact, Deseret Mutual is precluded from obtaining summary judgment in its favor on the Gardners' FMLA retaliation and Title VII retaliation claim (Fourth Cause of Action).

## ORDER

IT IS HEREBY ORDERED that Deseret Mutual's Amended Motion[245] is GRANTED as to the Gardners' breach of contract claim (Sixth Cause of Action) and breach of covenant of good faith and fair dealing claim (Seventh Cause of Action) relating to Mr. Gardner, and is DENIED as to the Gardners' FMLA retaliation and Title VII retaliation claim (Fourth Cause of Action) relating to Mr. Gardner.

Consequently, the Gardners' breach of contract claim (Sixth Cause of Action) and breach of covenant of good faith and fair dealing claim (Seventh Cause of Action) are DISMISSED WITH PREJUDICE.

Signed March 22, 2016.

BY THE COURT

David Nuffer
District Court Judge

---

[244] *See id.* ¶ 129.

[245] Amended Motion.